*Ana Beti Molina and Javier Molina v. State*,
Nos. 2380 & 2537, Sept. Term, 2017, Opinion by Leahy, J.

**Evidence > Circumstantial Evidence**

Circumstantial evidence may be just as relevant as direct evidence, and our cases do not require any "greater degree of certainty [] when the evidence is circumstantial than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused." *Hebron v. State*, 331 Md. 219, 226-27 (1993) (internal citations omitted).

**Evidence > Circumstantial Evidence**

The significance of a single strand of circumstantial evidence may be unclear when isolated from the larger tapestry. *See Sewell v. State*, 239 Md. App. 571, 614 n.12 (2018). To determine relevance, then, we must not view a piece of circumstantial evidence "in a vacuum, devoid of consideration of the other circumstances in the case." *Cf. Smith v. State*, 423 Md. 573, 590 (2011).

**Evidence > Defendant's Financial Status > Special Circumstances**

There is a distinction of legal significance between offering evidence of a defendant's impecuniosity to show motive for theft, and offering evidence of a defendant's impecuniosity combined with other "special circumstances"—such as evidence that the defendant acquired money contemporaneously with the theft—to show that the money the defendant acquired was connected to the theft.

**Criminal Procedure > Joinder and Severance of Defendants > Discretion of Trial Judge**

Appellate review of a trial judge's denial of separate trials is to resolve whether the trial judge abused the discretion endowed by Rule 4-253(c).

**Criminal Procedure > Joinder and Severance of Defendants > Prejudice**

Within the meaning of Rule 4-253, prejudice "is a term of art, and refers only to prejudice *resulting* to the defendant *from* the reception of evidence that would have been inadmissible against that defendant had there been no joinder." *Hines v. State*, 450 Md. 352, 369 (2016)

(citation and internal quotation marks and brackets omitted). Thus, in the absence of non-mutually admissible evidence, a trial judge is not required to engage in the second part of the *Hines* analysis to "determine whether the admission of such evidence will unfairly prejudice the defendant seeking a severance." *Id.* at 379.

## Criminal Procedure > Inadmissibility of Evidence

An appellant may not assert, as a ground for reversal, the inadmissibility of evidence when she elicited substantially the same evidence herself. *See Miller v. State*, 421 Md. 609, 629 (2011) (holding that the defendant's cross-examination of the State's expert witness "'opened the door' to the opinion that was elicited on redirect examination").

## Criminal Procedure > Inadmissibility of Evidence > Cumulative Evidence

Opinion testimony—even if admitted erroneously—that is cumulative of opinion evidence offered by several other witnesses may render the error undoubtedly harmless. *See Dove v. State*, 415 Md. 727, 743-44 (2010) ("In considering whether an error was harmless, we also consider whether the evidence presented in error was cumulative evidence.").

## Criminal Procedure > Jury Instructions > Accomplice Liability

When there is no direct evidence of an alleged accomplice's communications with the principal and, consequently, no direct evidence that the alleged accomplice communicated with the principal his willingness to participate in or lend support to her crimes, circumstantial evidence may satisfy the State's burden to produce some evidence that the accomplice knowingly aided the principal in the commission of the crimes charged.

## Criminal Procedure > Jury Instructions > Accomplice Liability

To generate a jury instruction on a defendant's liability as an accomplice in another's crimes, the State need not prove the defendant's knowing participation beyond a reasonable doubt or even by a preponderance of the evidence. The State need adduce only some evidence that the defendant acted as an accomplice in the commission of the crimes charged. *See Arthur v. State*, 420 Md. 512, 526 (2011).

**Criminal Law > Financial Exploitation of Vulnerable Adults**

Evidence that supports a jury's findings, beyond a reasonable doubt, that the defendant knew or reasonably should have known that an individual was a vulnerable adult, or that an individual was at least 68 years of age; and, that the defendant "knowingly and willfully" exploited the individual by obtaining his or her property by deception, intimidation, or undue influence, is sufficient to support a conviction for financial exploitation. CR § 8-801(b).

**Criminal Law > Theft > Required Knowledge**

Under each of the three theft modalities contained in section 7-104 of the Criminal Law Article—(1) unauthorized control over property, (2) unauthorized control over property by deception, and (3) possession of stolen property—the State is required to prove the defendant's scienter—either that she "willfully or knowingly" deprived another of the property or that she knew the property was stolen.

**Criminal Law > Conspiracy > Required Evidence**

The essence of a criminal conspiracy is an unlawful agreement, which "need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design." *Mitchell v. State*, 363 Md. 130, 145 (2001) (citations omitted). To prove conspiracy, the State may rely on "circumstantial evidence, from which a common scheme may be inferred." *Hall v. State*, 233 Md. App. 118, 138 (2017). The State does not have to show an "overt act in furtherance of the agreement" because the conspiracy "is complete when the unlawful agreement is reached[.]" *Bordley v. State*, 205 Md. App. 692, 723 (citation and internal quotation marks omitted).

**Criminal Law > Conspiracy > Multiple Convictions**

In Maryland, "only one sentence can be imposed for a single common law conspiracy no matter how many criminal acts the conspirators have agreed to commit" because the "unit of prosecution [for conspiracy] is the agreement or combination rather than each of its criminal objectives." *Tracy v. State*, 319 Md. 452, 459 (1990). The conviction of a defendant for more than one conspiracy turns, therefore, "on whether there exists more than one unlawful agreement." *Savage v. State*, 212 Md. App. 1, 13 (2013). "If a defendant is convicted of and sentenced for multiple conspiracies when, in fact, only one conspiracy was proven, the Double Jeopardy Clause has been violated." *Id.* at 26.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

**CONSOLIDATED**

Nos. 2380 & 2537

September Term, 2017

_____

ANA BETI MOLINA

v.

STATE OF MARYLAND

_____

JAVIER MOLINA

v.

STATE OF MARYLAND

_____

Kehoe,
Leahy,
Adkins, Sally D.,
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed:  December 23, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

# TABLE OF CONTENTS

## BACKGROUND

**The Indictments** ………………………………………………………… 4

**Pre-Trial Motions** ……………………………………………………… 5

**Trial** ……………………………………………………………………... 6

       A. The Molinas ………………………………………………………... 6
       B. Gustave Shapiro ……………………………………………………6
       C. Ana Assumes the Care of Gustave ……………………………… 9
       D. Dementia and Other Diagnoses …………………………………… 15
       E. A Second APS Investigation in 2015 …………………………………17
       F. The House on Wilton Oaks……………………………………………21
       G. The Third APS Investigation in 2016…………………………………25
       H. End-Stage Dementia ………………………………………………… 32
       I. Additional Financial Evidence……………………………………… 34
       J. Motions for Judgment of Acquittal ……………………………….. 40
       K. The Defense………………………………………………… ……. 41
       L. Renewed Motions for Judgment ……………………………….. 42

**Verdict and Sentencing** ……………………………………………….. 44

## DISCUSSION

    I.     Evidence of Gambling and the Molinas' Financial Status …………………… 47
       A. Motions in Limine ………………………………………… 47
       B. Parties' Contentions on Appeal ..……………………………… 49
       C. Gambling and Finances: Special Circumstances ………………………… 50
    II.    Motion to Sever ……………………………………………… 60
       A. Pre-Trial Ruling ………………………………………… 62
       B. Analysis ……………………………………………….. 63
    III.   Lay Opinion Evidence…………………………………………… 67
       A. Motion in Limine ……………………………………… 68
       B. Testimony on Duty of Fiduciary ……………………………… 69
       C. Testimony on Gustave's Capacity ……………………………… 70
    IV.   Accomplice Liability ……………………………………… 72
    V.    Sufficiency of the Evidence Against Ana …………………………… 78
    VI.   Sufficiency of the Evidence Against Javier ………………………… 88
       A. Financial Exploitation …………………………………… 88
       B. Theft Scheme ……………………………………… 91
       C. Conspiracy ……………………………………………… 96
    VII.  The State's Rebuttal Closing Argument ………………………… 101

Gustave Shapiro, a widowed nonagenarian, depended on others for his transportation and daily care—he was a vulnerable adult.[1]  In 2016, Montgomery County Adult Protective Services ("APS") removed Gustave from the house in which he was residing with Ana Beti Molina and her husband, Javier Molina (the "Molinas" or "Appellants").  He died from severe dementia just one week later, at the age of 99.

A grand jury in Montgomery County indicted the Molinas on several charges relating to their financial gains from Gustave, including theft scheme, financial exploitation of a vulnerable adult, and financial exploitation of a person over 68 years old.  The couple stood trial, as co-defendants, before a jury in the Circuit Court for Montgomery County.

At trial, the evidence revealed that Ana was hired in 2012 to clean Gustave's house after his wife passed away.  Within months, Gustave became estranged from his only living son, Dana Shapiro, and Ana gained control of Gustave's medical care and finances.  Over defense objections, the State introduced evidence that the Molinas declared income

---

[1] The Maryland Code defines "vulnerable adult" as "an adult who lacks the physical or mental capacity to provide for the adult's daily needs."  Criminal Law Article, § 3-604(a)(10).  Section 8-801(b)(1) of the Criminal Law Article prohibits the exploitation of a person who meets the definition of a vulnerable adult.  Subsection (b)(2), added in 2009, expanded the prohibition against financial exploitation of individuals who are at least 68 years old.  More recently, the 2016 Justice Reinvestment Act altered the penalties for financial exploitation of a vulnerable adult.  *See* SB 1005 (2016).

One of the most significant risk factors for exploitation is cognitive impairment of the vulnerable adult.  Kevin E. Hansen et al., *Criminal and Adult Protection Financial Exploitation Laws in the United States: How Do the Statutes Measure Up to Existing Research?*, 42 Mitchell Hamline L. Rev. 897, 898 (2016).  Studies show that more than a third of elderly individuals have some type of disability, "i.e., difficulty in hearing, vision, cognition, ambulation, self-care, or independent living," and that with increased age comes an increased need for caregiving.  ADMIN. FOR CMTY. LIVING, 2018 PROFILE OF OLDER AMERICANS 14, 15 (2018).

between $26,000 and $68,000 from 2012 to 2016, along with evidence that the Molinas, primarily Javier, suffered gambling losses of more than $200,000 from 2011 to 2016. Also, between 2012 and 2016, $450,000 was withdrawn from Gustave's bank accounts to purchase a new vehicle for the Molinas and a new house in which the Molinas lived with Gustave. Neither the house nor the car had accommodations for Gustave, who was wheelchair-bound. More than $60,000 was withdrawn to pay college tuition for the Molinas' daughter, and another $60,000 was withdrawn from ATMs near two casinos where Javier gambled. The jury found each of the Molinas guilty of theft scheme, two counts of financial exploitation, and conspiracy to commit these crimes. Separately, the jury found Ana guilty of two counts of misappropriation by a fiduciary.

Ana and Javier appealed and each presented four issues for our review, which we have consolidated, reordered, and rephrased as follows:

I.     Did the circuit court err or abuse its discretion by permitting evidence of the Molinas' financial circumstances and Javier's gambling?

II.    Did the circuit court err by denying Ana's motion to sever her trial from Javier's?

III.   Did the circuit court err by allowing opinion evidence by one of Gustave's attorneys?

IV.    Did the circuit court err in instructing the jury on accomplice liability?

V.     Was the evidence sufficient to convict Ana of financial exploitation?

VI.    Was the evidence sufficient to convict Javier of financial exploitation, theft scheme, and conspiracy?

VII.   Did the circuit court err by permitting impermissible rebuttal argument by the prosecution?

2

The statute featured in this case, Maryland Code, Criminal Law Article ("CR"), § 8-801 was enacted by the General Assembly in 2002 to prohibit the financial exploitation of vulnerable adults, and then amended in 2009 to include a prohibition against the financial exploitation of individuals who are at least 68 years old. *See* SB 646 (2002); HB 559 (2002); SB 304 (2009); HB 583 (2009). As Delegate Kramer, the sponsor of House Bill 583, wrote in 2009, "The financial exploitation of the elderly is a significant problem and perhaps the fastest-growing crime in the nation."[2] Our appellate courts have had few opportunities to consider CR § 8-801; indeed, the sole reported opinion discussing the statute, *Tarray v. State*, 410 Md. 594 (2009), pre-dates the 2009 amendment and examines only the prohibition against the financial exploitation of vulnerable adults.

The case before us is the kind that the General Assembly intended to address when it enacted the financial exploitation statutory scheme.[3] As is common for many vulnerable

---

[2] The bill file for House Bill 583 from the 2009 session contains a letter from the Maryland Department of Aging, stating that "[f]inancial fraud is the fastest growing form of elder abuse" but "the incidence and impact of exploitation are difficult to measure because there is no national reporting mechanism, cases are too frequently unreported, definitions vary and the crimes are difficult to detect." *See* Bill File for HB 583 (2009) (available at the Department of Legislative Services Library).

[3] Recognizing the inability of many victims of financial exploitation to defend themselves, the General Assembly passed additional legislation in 2016 and 2018 authorizing divisions of the Office of the Attorney General to bring a civil action for damages against violators of CR § 8-801 on behalf of the victim or the victim's estate. *See* HB 718 (2016) (amending Maryland Code (2013 Repl. Vol., 2015 Supp.), Commercial Law Article, § 13-204); HB 1506 (2018) (amending Maryland Code (2014 Repl. Vol., 2017 Supp.), Corporations and Associations Article, § 11-209). The Fiscal and Policy Note for HB 1506 reported that the circuit courts saw 121 violations of CR § 8-801 (resulting in 24 guilty dispositions) in 2017, likely motivating the expansion of the number of divisions within OAG that can bring the civil actions.

adults, Gustave's cognitive impairment, caused by his worsening dementia and advanced age, prevented him from appreciating the financial abuse at the time. Although the evidence of the Molinas' intent to commit financial exploitation was largely circumstantial, we hold that it was more than sufficient to support the jury's verdicts. Finding no error or abuse of discretion in the trial court's rulings, we affirm the jury's verdicts, but remand Javier's case to the circuit court to vacate one of his two conspiracy convictions.

## BACKGROUND

### The Indictments

On February 2, 2017, a grand jury sitting in Montgomery County returned indictments against Ana and Javier, respectively. As relevant to this appeal,[4] the first six counts in each indictment were for crimes against Gustave: (1) theft scheme over the value of $100,000 in violation of Maryland Code (2002, 2012 Repl. Vol., 2017 Supp.), CR § 7-104; (2) conspiracy to commit theft scheme over the value of $100,000; (3) financial exploitation, value over $100,000, of an adult over 68 in violation of CR § 8-801(b)(2); (4) conspiracy to exploit a vulnerable adult: value over $100,000; (5) financial exploitation, value over $100,000, of a vulnerable adult in violation of CR § 8-801(b)(1); and (6)

---

[4] The grand jury also indicted both Ana and Javier on eight additional counts for crimes against the United States Department of Housing and Urban Development ("HUD"), false statements affecting housing assistance, and crimes against the Maryland Department of Health and Mental Hygiene ("DHMH").

conspiracy to exploit a vulnerable adult: value over $100,000.[5]  Ana was also charged with

two counts of misappropriation by a fiduciary.

## Pre-Trial Motions

Four pre-trial motions are relevant to this appeal.  They are treated fully in the

discussion but outlined here for context.  First, on April 28, 2017, the court granted a

motion by the State, over the defendants' objections, to consolidate the cases against Ana

and Javier.[6]  The court revisited this issue later in response to Ana's motion to sever the

cases and reaffirmed its earlier ruling.

The Molinas, through two motions in limine, moved to exclude evidence of their

gambling and financial status.  They urged the court to bar the evidence because it was

irrelevant and unduly prejudicial.  The State responded that the gambling records were

relevant both to show motive and to show where the money went—a fundamental element

of the theft charges.  The circuit court denied the Molinas' motions to suppress the

---

[5] The date range for Counts 1-5 on both indictments was "on or about and between September 2, 2012, through September 13, 2016."  The date range for Count 6 on both indictments was "on or about and between November 11, 2014, through February 5, 2015."

[6] Following a hearing on May 26, 2017, the court granted the Molinas' motions to sever the counts relating to Gustave from the other counts relating to HUD, DHMH and Medicaid fraud.  Ana had also moved to dismiss Counts 4 and 6 as multiplicitous because both alleged conspiracy to commit financial exploitation of a vulnerable adult, with the only difference being the date range.  The issue became moot when, at the hearing, the State nolle prossed Count 6 for conspiracy to commit financial exploitation of a vulnerable adult, in an amount over $100,000, between November 11, 2014 and February 5, 2015. Subsequently, on July 13, 2017, the State entered a nolle prosequi for the corresponding count against Javier (also Count 6).

gambling evidence, granted Javier a continuing objection on the issue, and ultimately allowed the State to introduce evidence of the Molinas' financial circumstances.

In a fourth pre-trial motion, the State sought to prohibit Elizabeth Goldberg, an attorney, from offering opinion testimony at trial as to Gustave's capacity to execute legal documents. The court denied the State's motion.

## Trial

The Molinas' trial took place over eight days between November 13 and 27, 2017. The State called 26 witnesses to testify. The following account is derived from the evidence adduced at trial, viewed in the light most favorable to the State.

### A. The Molinas

Ana and Javier were married with three children. In 2012, their oldest child, Janesse, was 22, and their two minor children were 17 and 14 years old. The Molinas lived in a three-bedroom apartment in Montgomery County from 1996 through 2015. Their rent for that apartment, from 2010 until they moved out, was $484 per month. Javier worked at a car wash that paid him between $20,000 and $48,000 per year. He also declared about $43,000 in income from gambling between 2013 and 2016. Ana cleaned houses for a living, although she did not declare any income on her Maryland tax returns aside from an amount less than $8,000 earned from gambling between 2014 and 2016. She began working for Gustave in September 2012.

### B. Gustave Shapiro

Gustave was born in July 1917. He eventually married Ruth, and the couple adopted two sons, Dana and Marvin. Marvin would pre-decease his parents but, before he died, he

6

had a falling out with Gustave that caused Gustave to disavow Marvin. Dana, on the other hand, maintained a relationship with Gustave until September 2012.

Gustave worked as an electronics engineer for the federal government until his retirement. He owned a house on Munsey Street in Silver Spring where he lived with Ruth. In addition to the retirement income he received in the form of pension and Social Security payments, Gustave owned treasury bonds that reached maturity between April 2012 and June 2013. The income from these treasury bonds brought Gustave's bank account ending in -7829 to a balance of $1.9 million.

As far back as 2004, Gustave had trouble getting around and required the assistance of a walker. He did not drive or like to take taxis, so Dana drove his parents around on their errands, normally about twice a week. Gustave bought Dana a used sedan that accommodated Gustave's and Ruth's physical disabilities for around $22,000.

According to Dana, Gustave was frugal, had a strict budget, and "was adamantly against gambling." Gustave "never had a credit card, never would use a credit card[,]" and stopped investing in treasury securities after they went paperless because he felt his information and money would be exposed to hackers. From 2004 to 2012, Dana would have to drive Gustave regularly to the bank because Gustave did not have a debit card or use ATMs to withdraw cash. He also paid his bills by check.

By 2012, Dana began to observe his father experience delusional thinking. For instance, Gustave believed that his dead lawn had been poisoned by his neighbors in retaliation for a derogatory remark Gustave made 25 years earlier. Gustave also struggled to remember Dana's telephone number despite how frequently he had called over the years.

7

Between 3:00 and 4:00 a.m. on September 2, 2012, Gustave called Dana because he could not wake Ruth and did not think she was breathing. Gustave said he had not called 911 because he would not have had a way to follow the ambulance to the hospital without Dana. Dana beat the paramedics to his parents' house and found his mother unresponsive by her bed. Doctors were unable to resuscitate Ruth.

Dana began to see his father daily. According to Dana, his parents had been inseparable, and his father became very lonely and needy after Ruth died. Dana had a pre-planned vacation set for two weeks after his mother's passing, so he sought help to care for his dad while he was gone. Dana hired Ana, who came on a recommendation from his brother-in-law, Lloyd Flynn, to clean Gustave's house and look after him. Ana cleaned the homes of Mr. Flynn and Mr. Flynn's mother, and she continued to do so until the early part of 2015. Both Mr. Flynn and his mother paid Ana $200 each time she cleaned.

Dana, for his part, was "absolutely" satisfied with Ana's work when he returned from his trip—he "thought that she was very good at what she did." According to Dana, Ana was also better than he was at convincing Gustave to do things such as routine "hygiene" and "purchasing a new mattress for the bed which was severely soiled." Dana thought Gustave paid Ana too little and convinced his father to add an extra $20 the first time he paid her.

Soon after Ana began working for Gustave, Gustave claimed there was a box missing from under his kitchen table and thought either Dana or Ana took it. Gustave brought up the box with Dana when they went to lunch on the day after Thanksgiving. He became "extremely irate and angry" with Dana, accusing him of stealing the box. Gustave

8

demanded that Dana turn over his key to Gustave's house, or else, Gustave would call the police. Dana testified that he didn't know what his father was talking about; regardless, he returned the key, not wanting to make a scene. After that Gustave refused Dana's calls. Dana tried to call his father "[f]or well over a year" and also went by the house "[m]any times," but his father would either ignore his knock or slam the door and not let him in. Ana told Dana that she also had to stop talking to him, or else, Gustave said she would be fired.

## C. Ana Assumes the Care of Gustave

### 1. Large Banking Transactions Begin in 2013

After September 2012, with Dana no longer taking Gustave on his errands, Ana took over. The errands involved mainly trips to Gustave's doctors and his banks. Ana would take Gustave to the local branches of Wells Fargo Bank and Capital One Bank about once a month.

On June 13, 2013, Gustave and Ana opened a checking account and high-yield savings account at Wells Fargo, listing Gustave as the primary account holder and Ana as the secondary account holder. About a month later, Ana opened another checking account and high-yield savings account with Wells Fargo in her own name. Four days later, on July 22, a withdrawal of $9,900.47 from Gustave's account was deposited into Ana's personal account. Subsequent $300 deposits into Ana's account followed withdrawals from Gustave's account. Then, on August 10, Gustave and Ana went to Capital One with Janesse Molina and drew a cashier's check from Gustave's account in the amount of

$26,977.45 to pay for Janesse's college tuition at New York School of Visual Arts. Gustave withdrew another $37,242 for college tuition the following year.

The size of the transactions continued to increase. On September 9, 2013, a withdrawal of $50,000 from one of Gustave's accounts at Capital One caused Sophia Alhalaseh, an employee at the branch office in Wheaton, to refer Gustave to APS. Ms. Alhalaseh's supervisor instructed her to call APS because Gustave typically transacted only about $5,000 per month, so the $50,000 withdrawal marked a significant change in the nature of his transactions. Ms. Alhalaseh had never seen Javier.

Bank records show that, on the same day, September 9, a cashier's check in the amount of $300,000 was drawn from a Capital One account held solely by Gustave. The $300,000 cashier's check was then deposited into an account at Wells Fargo (ending in -9261) held jointly by Ana and Gustave that had been opened three days earlier.

### 2. First APS Investigation in 2013

Julia McGlamary is a social worker with APS who investigates allegations of abuse, neglect, and financial exploitation of vulnerable adults in Montgomery County. On October 11, 2013 she began an investigation into whether Gustave was being financially exploited. When she attempted to conduct a home visit at the Munsey Street address, on October 15, no one answered the door. While still on the doorstep, Ms. McGlamary called Gustave, who told her she could not come inside, he was well taken care of, and he didn't need her services. Two days later, Ms. McGlamary had a second, lengthier phone conversation with Gustave, during which he denied her services again. Gustave explained that he had hired a caregiver, a 45-year-old married woman with three children, to care for

10

him two to four days a week, and that her care included helping with grocery shopping, cleaning the house, and running errands. Gustave also told Ms. McGlamary that seeing his caregiver with her husband and kids made him feel as if he were part of their family.

Ms. McGlamary spoke with a bank manager at Capital One on October 24. In regard to the transaction that triggered the investigation, Ms. McGlamary explained that she "was informed that money was being transferred in cash withdrawals from a Capital One account to a Wells Fargo account," and that Gustave was the owner of both accounts.

A few days after the phone call with Capital One, Ms. McGlamary called Ana and scheduled an in-person meeting with Gustave for November 4. At the meeting, Gustave's home was clean and tidy. Gustave appeared to be oriented to person, place, and time. He completed a daily-living assessment during their meeting, scoring a 24 out of 30. Ms. McGlamary explained at trial that a score of 24 indicates that the subject has some difficulty and needs assistance with completing some tasks for daily living. The tasks with which Gustave required assistance were grocery shopping, transportation, housekeeping, taking his medications, and paying some of his bills due to problems he had with use of his hands. Gustave also scored a 14 out of 15 on a brief Mental Status exam that Ms. McGlamary administered. She explained that the score indicated Gustave likely had the capacity to make his own decisions at the moment in time that the test was administered.

According to Ms. McGlamary, Gustave's demeanor during the meeting was "fluctuat[ing] very quickly between being agitated and very angry and then being very calm." Gustave told Ms. McGlamary that he had a caregiver, Ana, but refused to disclose how much he paid her. He did tell her, however, that he paid the private-school tuition for

one of Ana's daughters. Gustave mentioned that he never wanted to leave his home on Munsey Street. He also told Ms. McGlamary that he threw his son out of his house because Dana had been "robbing [him] blind" and there were expensive tools and important documents missing—although, Gustave could not identify what they were.

After Ms. McGlamary met with Gustave and confirmed the information concerning the two different banks, APS closed the investigation on November 24, 2013.[7]

### 3. More Power and Money

#### *Banking Transactions*

Just three days after APS concluded its investigation, on November 27, 2013, another withdrawal of $50,000 was made from Gustave's account at Capital One. Although Gustave never had a debit card associated with his accounts, Ana requested one. Then, on December 30, Ruth's name was removed from a Capital One account ending in -7829 and Ana's name was added. Also on December 30, bank records show that the $300,000 that had been deposited on September 9 into Ana and Gustave's Wells Fargo account ending in -9261 was withdrawn and deposited into a Wells Fargo account held solely in Ana's name. Three days later, Ana and Gustave transferred $1.3 million from the Capital One account ending in -7829 into a new account, opened under both names, ending in -7237.

---

[7] Ms. McGlamary also testified that she never met Javier and that his name never came up during the investigation.

12

In April 2014, Ana was added to several other bank accounts that Gustave owned and she was named as a beneficiary on all of the accounts. Later that September, she was added as a co-lessee on one of Gustave's Capital One safe deposit boxes.

### Powers of Attorney

In early 2014, Ana and Gustave met with Elizabeth Goldberg, an elder-law attorney. The first meeting took place in a car in front of Ms. Goldberg's home office because Gustave did not want to get out of the car. The second meeting was at the office of Robert Moses, a title attorney. Ms. Goldberg, who testified at trial, explained the purpose of the second meeting:

> [Gustave] had wanted to have[] a revocable trust and some other documents prepared to give money to Ms. Molina. And then we were trying to come up with something that would . . . provide for him during his lifetime[.] You know, there was a little bit of confusion on his part[.] You have to have enough money for your own lifetime. So, he was very fixated on having it go to her, but[] Mr. Moses and I were trying to come up with a way to make sure [] that she could work with him but without[—w]e thought maybe he wasn't thinking fully about his own needs. He was still alive. He was going out, needed to be provided for . . . without worrying about the future when he was gone. So we prepared a power of attorney, healthcare power of attorney and a deed. . . .

After the meeting, Ms. Goldberg prepared a power of attorney and a healthcare power of attorney. Gustave executed both on March 14, 2014, in front of a witness and notary. Ms. Goldberg testified that she "talked to both [Gustave and Ana] about what was entailed . . . to spend money as noted on Mr. Shapiro's behalf." Concerned about whether APS had visited Gustave's house, Ms. Goldberg called APS herself. When APS informed her its investigation was closed, she still "didn't feel completely secure one way or another" and "didn't feel 100% comfortable with it." But she "just made a judgment" to go forward

with the transaction because she believed that Gustave "seemed to understand" the nature of the documents. Ms. Goldberg testified at trial that she did not know Javier, and his name was not on any of the documents she prepared.

### A New Toyota Highlander

On April 28, 2014, a cashier's check for $50,000 was drawn from one of Gustave's accounts, made payable to Ana Molina. Three days later, the Molinas paid $35,481.50 (plus a trade-in vehicle valued at $8,000) to purchase a 2014 Toyota Highlander from Darcars in Montgomery County. The vehicle did not include any modifications to make it handicap accessible. Ana's and Javier's names were on the sales invoice and title for the vehicle; Gustave's name was not on either document. At trial, Mr. Flynn (Dana's brother-in-law) testified that Ana told him that Javier's employer purchased the vehicle for Javier.

### The 2014 Will and Deed to the House

That September, Gustave met with Daniel Steven, an estate attorney. Mr. Steven had met with Gustave and Ruth previously in 2011, and again in 2012 before Ruth died. Ruth and Gustave hired Mr. Steven to draft a joint revocable trust and 'pour-over wills.'[8] Both of the wills and the trust listed Dana as the beneficiary and were designed to ensure

---

[8] At trial Mr. Steven explained that a will was technically not necessary because the trust is intended to be "the primary vehicle to transfer property when someone dies[.]" But to dispose of property through a trust, the client must title all property in the trust's name. And because "clients are not always totally compliant and sometimes [] don't title everything in the name of the revocable trust," the pour-over will acts as "a backup plan . . . that says that anything that is still titled in the name of the client rather than in the name of the trust, gets poured over into the trust, so you end up with everything in trust, which is the plan."

that the couple's assets went to Dana when the surviving spouse died. The wills were never executed.

When Mr. Steven met with Gustave again on September 3, 2014, Ana accompanied Gustave. On a video recording, which was played for the jury at the Molinas' trial, Gustave can be seen executing the will. The 2014 will designated Ana as the personal representative of Gustave's estate, gave Ana all Gustave's personal property, and bequeathed to Ana the residuary estate. The will also set out explicitly, "The omission of my child, Dana Shapiro, from the provisions of this Will is intentional on my part and is done with my full knowledge." In addition to the will, Mr. Steven drafted, and Gustave executed, a new deed on the Munsey Street property. For no consideration, the deed granted Ana the property in fee simple subject to a life estate in Gustave.

## D. Dementia and Other Diagnoses

All this time, Ana continued to take Gustave to his various appointments with doctors and specialists at Kaiser Permanente ("Kaiser"). On September 23, 2014, she brought Gustave to a follow-up appointment with the cardiology department. Dr. Joseph Joson diagnosed Gustave with congestive heart failure, cardiomyopathy, history of atrial fibrillation, a failure to thrive (based on 13-pound weight loss), hypotension, bradycardia (due to too much heart medication), and an enlarged prostate. He recommended palliative care for Gustave.

At a follow-up appointment three days later, Gustave's primary-care provider, Dr. Adrian Hurley, discussed the possibility of moving Gustave to an assisted-living facility but Gustave did not want to go. Dr. Hurley's notes reflect that Gustave was alert and

oriented that day. Still, Dr. Hurley referred Gustave to Dr. Andrew Dutka, a neurologist with Kaiser, because Gustave had abnormal thought processes and relayed non-sequiturs during appointments.

Accordingly, Dr. Dutka saw Gustave for an office visit on September 29, 2014— three weeks after Gustave signed the will in Mr. Steven's office. Gustave was not able to say why he was seeing a neurologist. Although Gustave knew what month it was and that he was in a doctor's office, he did not know which doctor's office or the year. Gustave also misstated his age, and Ana had to correct him. Dr. Dutka noted that Gustave couldn't remember a neck surgery he'd had and also repeated the same story several times.

Dr. Dutka found notes in Gustave's file indicating that he had seen a neurologist in 2006 because he was suffering from memory loss and gait disturbance. The file also contained an MRI report that showed atrophy and white matter in Gustave's brain, which was consistent with dementia without necessarily indicating the presence of the disease.

Gustave could not "start gaits" or "get his feet to move off the floor" without assistance. This led Dr. Dutka to believe that Gustave had gait apraxia, which he described at trial as a brain disorder that affects a person's ability to coordinate movement or push his or her foot off the floor.

Dr. Dutka diagnosed Gustave with mild senile dementia, which he described as "chronic or evolving over months rather than a sudden loss of cognitive ability" in someone who is over 65 and still has many of his faculties. When asked which day-to-day activities are affected by that diagnosis, Dr. Dutka explained: "Generally, those [] activities [t]hat are called instrumental activities of daily living[,] which include things like managing

16

finances, taking care of appointments, [] stocking the refrigerator and doing other things around the home." Dr. Dutka characterized the condition as mild, however, due to "the description of [Gustave] being able to read and dress himself and shower without assistance[,] indicating that his basic activities of daily living were intact."

### E. A Second APS Investigation in 2015

Following Gustave's dementia diagnosis, Ana continued driving him to his doctors' appointments and to do his banking. During one trip to the bank, on July 3, 2015, Ana pushed Gustave in his wheelchair into a Wells Fargo branch and presented a withdrawal slip for $100,000. Mohammed Aiyedogbon was working as a branch manager of the Wells Fargo that day and noticed that Gustave wasn't saying much and "could barely [] hold onto the pen [to] write," so Ana filled out the slip for him. According to Mr. Aiyedogbon, tellers presented with these scenarios are trained to try communicating with the customer rather than the caregiver. Mr. Aiyedogbon tried communicating directly with Gustave "to get a good understanding of if he knew what was being requested." But Mr. Aiyedogbon perceived that Gustave "seemed quite unsure." Ana was asking the questions and making the demands, which prompted Mr. Aiyedogbon to sit them down to inquire further.

According to Mr. Aiyedogbon's recollection of the conversation that followed, the purpose of the withdrawal was to move funds over to Ana. Gustave told Mr. Aiyedogbon that he was purchasing a property for Ana and her kids that would cost him about $400,000. Although Gustave said his son was his next of kin, Gustave said their relationship wasn't in a good place. It soon became clear to Mr. Aiyedogbon that Gustave "wasn't quite sure

17

what was going on," so Mr. Aiyedogbon consulted with his manager, and they determined to contact the elder-abuse line. The elder-abuse line instructed them to call the police.

Montgomery County police arrived and interviewed Ana and Gustave separately. Officer Jamie Rosner[9] interviewed Gustave and observed that he "was able to carry on a conversation for some amount of time but would often seem confused and would be unclear in his responses. He would respond to questions with conflicting answers and things like that." Gustave said the $100,000 he sought to withdraw was to supplement other funds he had already given Ana to purchase a house located in Silver Spring that had a listing price of $399,000. According to Gustave, Ana had driven him by the house three days prior, but he had not seen the inside of the house he was purchasing and would not be able to see it until he purchased it. Officer Rosner referred the case to a detective and to APS, and Ana and Gustave left without completing the $100,000 withdrawal.

Erin Howard, an investigator with APS, responded to the referral from Officer Rosner and Mr. Aiyedogbon. On July 13, ten days after the incident at the bank, Ms. Howard went to Gustave's house on Munsey Street. Ana answered the door, identified herself as Gustave's friend, and let Ms. Howard inside. Ms. Howard then had a conversation with Ana and Gustave,[10] in which she spoke primarily to Ana, but Gustave would also chime in. Gustave told Ms. Howard that he was in the process of buying a house so that he and Ana's family could live together. Ana then explained that Gustave's

---

[9] Officer Rosner became a special agent with the federal Bureau of Alcohol Tobacco & Firearms and Explosives before he testified as a State's witness at trial.

[10] Javier was not present at Gustave's home during Ms. Howard's visits.

house on Munsey Street had lead paint and asbestos, and that they wanted to get him a place that was more accessible. She also said that they planned to get Gustave a house with fewer steps and that they would install a chair lift. Although Ana told Ms. Howard that Gustave could walk independently, Ms. Howard did not see him do so herself.

Two days later, on July 15, Ms. Howard returned to the house on Munsey Street to speak with Gustave again. Ms. Howard determined that Gustave was a vulnerable adult because he needed assistance with medication reminders, bathing, dressing, grocery shopping, light chores, transportation, and paying bills. Gustave also had difficulty writing. He could eat independently, transfer chairs, brush his teeth, walk independently, prepare a light meal, use the telephone, use the bathroom, and plan and make decisions. Gustave scored a three out of six on 'the clock test.'[11] Ms. Howard testified that a score of three indicates moderate dementia. But also related that Gustave only scored a seven out of 15 on a structured evaluation to assess his cognitive impairment. Ms. Howard followed up with some of Gustave's doctors, and members of the office staff left her with the impression that, based on Gustave's medical records, she could close the APS investigation. At trial, however, she testified that her view of the case would have been different if Gustave's doctors had provided her accurate information about Gustave's diagnosis.

---

[11] The 'clock test' requires the subject to draw a clock. As Ms. Howard explained at trial, the clock test is a screening tool used to test cognitive status to "flag" if the subject requires more in-depth testing.

Bank records reflect that on July 17, 2015, two days after Ms. Howard's second visit with Gustave, Ana's status on two of Gustave's Wells Fargo accounts was changed from beneficiary to POA/POD.[12]

In sum, after knowing Gustave for little more than two years, Ana's name, either as joint owner, beneficiary, or POA/POD, was on at least seven of Gustave's separate checking and savings accounts at Wells Fargo and Capital One. Most of these accounts had been opened between mid-2013 and early 2014. Several large transactions, such as the transfer of $1.3 million and multiple $300,000 withdrawals and deposits, took place between the various accounts associated with Gustave and Ana, including the Wells Fargo account Ana opened in her own name in July 2013. In addition to taking the reins on Gustave's bank accounts, by the summer of 2015, Ana was added as a co-lessee on his safe deposit box at Capital One; granted power of attorney and healthcare power of attorney; made the sole beneficiary of his will; and deeded his Munsey Street property in fee simple subject to a life estate in Gustave. Moreover, Ana was listed, along with Javier, as titleholder to the $43,000 Toyota Highlander purchased primarily with Gustave's money. As we detail next, Ana and Javier were listed on the contract and deed for the Wilton Oaks property, also purchased with Gustave's money.

_____

[12] With POA, or power of attorney, Ana was authorized to act on behalf of Gustave, the account holder. The POD, or pay-on-death, designation made the accounts payable to Ana as beneficiary upon Gustave's death.

## F. The House on Wilton Oaks

## 1. The Purchase of a Non-Accessible House

Colleen Connor, a real estate agent, received a referral to help the Molinas purchase a house they found in Silver Spring. She testified at trial that she met with both Ana and Javier about purchasing the house, an older split-level. Ms. Connor explained that "there would have to be[] renovations made to make [the house] handicap accessible" because, as a split-level, you'd need to take stairs to go to the main level or the lower level, and there were also "a lot of stairs from the deck all the way down."

The first time Ms. Connor showed Ana the house, a least a few members of Ana's family were with her. The Molinas "talked a lot about there needing to be renovations made. They talked about having to extend the driveway. . . . [I]t seemed to be very, very important to them that that be done." Ana "mentioned a chair [] lift would be put in, and it would be sort of no problem[.]" Because of how quickly things were moving, Ms. Connor asked Ana how they would finance the purchase, to which Ana replied that "the man that [] she takes care of was going [] to purchase the property for her." Ms. Connor noted that, although he was present for the conversations, "Mr. Molina didn't do much talking at all[.]"

When Gustave eventually visited the property at Wilton Oaks, the Molinas drove him there. Ms. Connor, who showed them the property that day, later described the process of getting Gustave into the house as "tedious." She felt a general feeling of unease. But, she said, Ana was strong and helped Gustave up the stairs. Though Ms. Connor remembered Ana pointing out the rooms to Gustave, she noticed that Gustave didn't show

21

any real interest in the house and, instead, kept asking Ms. Connor questions about other, unrelated things. Gustave never viewed the lower level because, Ms. Connor said, it was difficult enough to get him up the stairs once.

On July 8, 2015, the Molinas and Gustave made an offer of $390,000 on the property at 13013 Wilton Oaks Drive in Silver Spring. Ana liked some of the furniture in the house, so they agreed to purchase that as well. Bank records show a deposit on the property in the form of a $40,000 cashier's check drawn from one of Gustave's accounts at Wells Fargo and made payable to Flynn Title.

Ms. Connor attended the closing along with Ana, Javier, and Gustave on August 18, 2015. The contract to purchase the property listed the purchasers as Ana, Javier, and Gustave. The deed listed Gustave, Javier, and Ana, with Gustave as the life tenant and the Molinas as remaindermen.[13] They paid cash for the property. A wire transfer of $298,937.86 was debited from the Wells Fargo account that Ana owned solely—the same account into which she deposited $300,000 in December 2013, following a $300,000 withdrawal from Gustave's Wells Fargo account ending in -9261. Gustave's bank records also reflect a separate wire transfer for $60,000 to cover costs at closing, bringing the total funds withdrawn for the purchase of the house, and furniture, to $398,937. The Molinas soon moved into the house on Wilton Oaks Drive with their children and Gustave.

---

[13] Mr. Steven would testify at trial that he spoke to Ana and Gustave over the phone in July 2015 and drafted language for the Wilton Oaks title similar to the language he used in September 2014 giving Ana a fee simple in the Munsey Street property, subject to a life estate in Gustave.

## 2. Life at Wilton Oaks

At some point in 2015, Ana stopped bringing Gustave to the bank with her. But she continued to transact business at the bank as joint owner of the accounts and through her power of attorney. She told Ms. Alhalaseh at Capital One that Gustave had been diagnosed with dementia.

Ana did continue to take Gustave to his doctors' appointments. Notes from a November 27, 2015 visit reflect that Ana told a doctor that she was concerned by Gustave's abusive language and his "escalating physicality." At another appointment in February 2016, she brought Gustave to see Dr. Hurley to address mood changes and outbursts that Gustave was experiencing after moving out of his home on Munsey Street. Dr. Hurley noted, in relation to Gustave's outbursts, that Gustave was upset because he "was a voracious reader and reportedly had a huge book collection." When Gustave was moved to Wilton Oaks with the Molinas, his book collection was left at the house on Munsey Street.

Ana met with Dr. Hurley, without Gustave, on March 3, 2016, to review Gustave's "express wishes." Ana reported to Dr. Hurley that Gustave was becoming "increasingly difficult to manage." Although Ana continued to handle activities such as cooking, cleaning, bill paying, and managing the home, she said that Gustave "requir[ed] more intense assistance with his normal daily activities." Dr. Hurley reviewed with Ana, as Gustave's power of attorney, a document called the 'five wishes' and they completed a Medical Orders for Life-Sustaining Treatment ("MOLST") document, which sets out what should be done if the patient is found non-responsive.

Later that month, on March 15, police responded to the Wilton Oaks house when Ana called to report that Gustave was suicidal and threatening to hurt others in the house. Ana referred to Gustave as her father and told Officer Whitney Kujawa that Gustave was threatening to hurt people because he had not been taking his medications for dementia and depression. Officer Kujawa completed an emergency evaluation petition to have Gustave evaluated against his will, and first-responders then transported him to the hospital.

Three days later, Gustave had another appointment with Dr. Hurley to address his agitation. Ana reported that Gustave "had become much more aggressive and hostile towards her and [had] struck her." Gustave shouted and jumped at Dr. Hurley when he entered the room. Dr. Hurley recalled at trial that Gustave "didn't know where he was or what time [it was]. He was having some paranoid thoughts and they were loose and disjointed and they were just rambling." Gustave could not complete the clock test and had no short-term memories. After the appointment, Dr. Hurley heard a call over the loudspeaker that there was a medical alert to which police were called because Gustave had reportedly swung at other patients in the pharmacy. Dr. Hurley subsequently referred Gustave to the psychiatry department.

After the incident at the pharmacy, an in-home nursing agency, Complete Care Solutions, began assisting in Gustave's care based on a referral from Kaiser. The owner of Complete Care, Sonia Mundle Smith, inspected the house on Wilton Oaks and noticed that it was inadequate for Gustave's physical condition. The main problem, as she saw it, was that the split-level house had no wheelchair access to accommodate Gustave's lack of mobility. According to Ms. Smith, Ana mentioned that living in a house that was not

24

handicap-accessible would help justify her moving Gustave to an assisted-living facility. Ms. Smith also recounted a conversation with Ana about the Toyota Highlander, in which Ana claimed that Gustave used to pay her an allowance but stopped doing so when he purchased the Highlander (contrary to her assertion to Mr. Flynn that the vehicle was purchased by Javier's employer).

Ms. Smith testified that Gustave said he used to have a lot of money, but Ana had taken it all, so he wanted to die. Around the same time, Ana bluntly told Ms. Smith that she worried Gustave would not die and lamented that she had paid for his funeral expenses up front: "when you do that, they don't die."

Complete Care began working on an as-needed basis, but that gradually evolved to 24-hour care beginning in May 2016, when Ana was leaving for a family reunion in Peru. Yvonne Mundle, a certified nursing assistant, began working 12-hour shifts a few days a week while Ana was gone. Ms. Mundle testified that she thought that "everything was great" when she started. But soon, Gustave's clothes went from being washed weekly to being washed every other week before eventually they were washed only once every three weeks. When Ms. Mundle asked Ana about the clothes piling up, Ana said she was busy. Still, Ms. Mundle observed that Gustave would ask for Ana, and that whenever Ana would come and say good morning to him, Gustave would have a good day and not be in a bad mood.

## G. The Third APS Investigation in 2016

### 1. Records Review and In-Person Assessments.

Ms. Smith referred Gustave's case to APS, thereby launching a third investigation

25

by the agency into Gustave's circumstances. Judith Libert, a clinical social worker with a specialization in geriatrics, set out, in June 2016, to determine whether Gustave was a vulnerable adult who was being financially exploited. In her testimony at trial, she noted that she began her investigation by calling Ms. Smith at Complete Care, and then she called Gustave's doctors to obtain medical records and also his banks to obtain his financial records. She reviewed the reports that Ms. McGlamary and Ms. Howard, respectively, had made of the first two APS investigations. On July 5, Ms. Libert made an unannounced visit to the Wilton Oaks house to assess Gustave in person.

When Ms. Libert arrived, the Molinas were not home. She went inside and noticed that "you had to immediately go down a flight of stairs or up a flight of stairs." Although she knew Gustave used a wheelchair, she noted that there was no chair lift installed. She also observed that the house was decorated beautifully, with a large, sectional leather couch in the living room downstairs, as well as "a huge flat-panel TV across the room." She noted that the dining room furniture was "very modern and it was barstool height[,]" which "didn't seem like a very good set up for [an] elderly person."

The caretaker on duty escorted Ms. Libert upstairs to Gustave's room, where Ms. Libert found Gustave seated in his wheelchair. Gustave looked "extremely frail," "very very thin." His room was "extremely hot" with a space-heater on; yet, Gustave was wearing a fleece jacket and sweatpants. Ms. Libert pulled up a chair very close to Gustave's wheelchair and asked if he knew why she was there, to which Gustave responded by asking how many zeros were in 2 million dollars. He then said, "money, money, money."

26

Ms. Libert began her psychosocial assessment with some basic questions. The next day was Gustave's 99th birthday, so she asked him if he knew the next day "[wa]s a very important day," but "he had no idea." Gustave didn't know his age, and when Ms. Libert asked for his address, Gustave responded, *"They brought me here. They didn't ask me. I want to go to my house."* (Emphasis added). Gustave also volunteered that he did not know when he started giving Ana money and he didn't know when he stopped. Ms. Libert tried to ascertain whether Gustave knew how much money he'd given Ana, but Gustave didn't know. Gustave scored a five out of 30 when Ms. Libert administered a daily-living assessment. She noted that Gustave had scored a 23 out of 30 on the same assessment only a year prior during the second APS investigation.

During the interview, Ana opened the door without knocking, walked in, and gave Gustave "a huge hug and rubbed his face and was like greeting him." Ms. Libert testified at trial that Gustave looked "very pleased to see her." Ana fed Gustave a pill from a spoon without explaining what the medicine was, stating simply that she "had not had a chance to give him his morning medicine." Ms. Libert asked Ana to leave the room, so she could finish the interview in private.

Ms. Libert went downstairs after her assessment of Gustave to speak with Ana in the kitchen. Without prompting, Ana "immediately volunteered" several documents by "shoving some papers across the counter in the kitchen[.]" Among the papers that Ana showed Ms. Libert were the deeds to two houses and a will. Again without prompting, Ana told Ms. Libert that she "get[s] it all" when Gustave dies. Ms. Libert asked what "all" was—if there were more assets—and then Ana informed her that Gustave had "$600,000

27

in [C]apital [O]ne and $250,000 in Wells Fargo." Ms. Libert later testified that she thought it "seem[ed] unusual that a person would leave everything to someone they have known for such a short period of time when they have living relatives."

Ms. Libert continued her investigation after she left the Wilton Oaks house. She reviewed all Gustave's medical records dating back to January 2013, including neurological evaluations and cognitive exams. She called the attorney, Mr. Steven, who prepared Gustave's will; she called Gustave's banks; and she spoke to Dana and her referral source several times. At the end of her investigation, Ms. Libert ruled that Gustave "definitely had suspected incapacity." She also believed she "had enough findings to indicate that financial exploitation had occurred." As a result, Gustave's case remained open "as a continuing [APS] case." Ms. Libert then asked Dr. Patricia Nay, a geriatric physician who works in palliative medicine, to evaluate Gustave.

### 2. Evaluation by Dr. Nay

Dr. Nay evaluated Gustave for 85 minutes on August 12, 2016. Ana was not there during Dr. Nay's visit. Although it was an unannounced visit, the house was "very well-kept," "very neat and clean." Gustave was sitting in a chair, in his room, wearing a diaper and no pants.

Dr. Nay attempted to take Gustave's medical history, but he was unable to tell her about his past or current medical issues or his current medications. Nor could he tell her where he was born or how he ended up living in the area. He did, however, confirm, after "much prompting," that his wife had died. But Gustave "couldn't remember his wife's name or anything about his wife. . . He couldn't recall if he had children." It wasn't until

28

Dr. Nay named one of his sons that Gustave finally "recall[ed] that he had a son." Gustave did not remember anything about his own work history, although he remembered that he went to George Washington University.

Dr. Nay performed a mental-status exam to assess Gustave's cognitive abilities. At trial, she described her interaction with Gustave:

> [He appeared] alert and . . . oriented to self. He knew his name. He did not know the[] day of week, the date, the year, any of that information. Th[e] season. **He didn't know if he was in his house or another person's house** and then he decided yes, it was his home. He didn't know his current address or any past addresses or what state he was living in.
>
> He was cooperative throughout the interview. His speech was clear. And **I could understand the words he was saying but sometimes it wouldn't make sense to the question I would ask**. So I might ask a question maybe about his medical history and he may say – he repeated the phrase urdy Gertie urdy Gertie. And he would say things like that and I wasn't sure what he meant. **And . . . a lot of times he would answer something but it wasn't the question I asked. He would just make a statement.** He wasn't anxious when I was there. **He was a bit paranoid.**
>
> He did not appear to be depressed during my interview. **He [] clearly had short-term and long-term memory deficits**[,] which I mentioned already about not knowing about his children or his wife or his education.
>
>        \*   \*   \*
>
> So **he did not understand his current situation and that he needed 24-hour caregivers for the last several years.** He seemed to think that he was able to care for himself and didn't – when I asked about this woman who was there, this caregiver that cared for him, she helped him get dressed, to toilet him, to clean him, to dress him, to feed him but he didn't understand that he needed that help.
>
> **I asked if he paid anyone to help him and he said yes. He said he had a woman who paid his bills.** . . . He came back to this throughout the time that I was there. And I asked him [] did he have a lot of bills to pay and he said the usual but **he couldn't tell me what kinds of bills he paid. But he continued to say he paid $100,000 to have this done and that's what it cost**.

(Emphasis added).

29

Dr. Nay also opined that Gustave did not understand anything about his bank accounts, investments, or property:

> I was trying to assess whether he understood what assets and what money he had. So starting with questions as simple as what bank do you use, do you get a retirement check, what kind of income do you have, do you have a lot of money in a savings account, do you have an investment? He was not able to answer any of those questions at all for me.

As far as Gustave's executive functioning, Dr. Nay related:

> [H]e had severe impairment with his insight and judgment that he wasn't able to for instance manage his finances because he didn't understand what he had or what the cost of services would be and that he . . . couldn't do a shopping trip. He couldn't plan how to fix the meal. That he relied on others to do those things for him.

Dr. Nay explained that a person suffering from dementia or Alzheimer's disease may still be oriented to self, time, and place. She described Alzheimer's effects on a patient's executive functions:

> People with impairment in executive function[,] the more complex the issue the more difficulty they would have making the decision. So for instance while they may be able to pay cash for a drink at a restaurant and go in and get a coffee[,] they may not be able to balance their checkbook. They may not be able to make a real estate transaction. They may not be able to figure out what to do with their investments. So it depends on the level[.]

Dr. Nay confirmed Gustave's prior diagnosis of dementia. Specifically, she testified, within a reasonable degree of medical certainty, that Gustave had a mental disability—either Alzheimer's disease and multi-infarct or vascular dementia. According to Dr. Nay, *"[t]he duration of the dementia would have been from 2006 to the [] date of my evaluation in August of 2016.*" (Emphasis added). By August 12, the date of her visit,

30

Gustave had "severe end-stage Alzheimer's disease," which she said puts patients "at increased risk for infections such as [] pneumonia or urinary tract infections and then that [] illness can lead to [] death."

Gustave's disability, Dr. Nay explained, impaired his insight, judgment, and executive function, which "affected his ability to make decisions about himself or his property." She determined that Gustave lacked the capacity and "didn't have the skills needed to manage his property. That would be all his assets, his money, his belongings." In regard to Gustave's inability to make decisions regarding his health or medical care, Dr. Nay testified that

> he didn't understand what his current status was regarding his health, he didn't understand what medical problems he had or had in the past. He wasn't able to remember if he was on any medicines. And if you don't know what your problems are and if you don't know what your medicines are it is hard to make decisions about your healthcare and how that may affect you. He also showed deficits in his judgment about things regarding that. And he had problems with his judgment going back years before I had seen him about what to do with medical emergencies.

Dr. Nay offered, as an example of Gustave's inability to respond to medical emergencies, Gustave's failure to call 911 when he found his wife non-responsive in 2012. In Dr. Nay's estimation, Gustave's reaction—taking 30 minutes to call Dana, rather than 911, because he wanted to ride to the hospital with Ruth—did not indicate that he panicked but that he didn't understand the situation. Dr. Nay's review of Gustave's record also revealed evidence pre-dating Ruth's death that Gustave was suffering from paranoia and delusions, which continued after her death as he isolated himself and became increasingly paranoid.

Another example that Dr. Nay offered was when Gustave, in 2010, had paranoid delusions about people spying on him from his neighbor's shed.

### 3. Referral to State's Attorney's Office

In August 2016, APS referred Gustave's case to Daniel Wortman, a special investigator assigned to the Montgomery County State's Attorney's Office, Special Prosecutions Division, to investigate possible financial exploitation. Mr. Wortman subsequently met with Gustave at the Wilton Oaks house with Ana and one of the Molinas' daughters present. Gustave appeared to be confused during the interview; Ana held his hand under the table. The remainder of Mr. Wortman's investigation involved looking into Gustave's financial records and the Molinas' financial records. He testified at trial as an expert in financial-crimes analysis. We will discuss his testimony in more detail below.

### H. End-Stage Dementia

APS referred Gustave to the ManorCare assisted-nursing facility in Potomac on September 13, 2016. Dr. Loreto Albiol, the medical director of ManorCare Potomac, testified for the State at trial as an expert in geriatric medicine. He explained that, when Gustave arrived at ManorCare, he was 99; "very cache[c]tic[,]" meaning he was "very weak, very emaciated[;]" he didn't have a lot of muscle mass and "probably had not been eating well." The "biggest diagnosis," as described by Dr. Albiol, was Gustave's severe and advanced dementia—Gustave wasn't oriented to himself, and couldn't state his age, where he was, whether he had children, or what happened to him. According to Dr. Albiol, doctors needed to evaluate Gustave further to determine whether he suffered from vascular dementia or Alzheimer's type dementia. Although there is no "definite test" to determine

whether a patient suffers from Alzheimer's specifically because "it is a process," Dr. Albiol opined that "you don't get dementia overnight. You get dementia over a long period of time. I think it's five to 15 years."

Only a week after Gustave arrived at ManorCare, he died on September 20, 2016. His death certificate listed the immediate causes of Gustave's death as bilateral pneumonia, dysphagia,[14] and advanced dementia.

But before Gustave passed away, Catherine McQueen, Esq. was designated as guardian of Gustave's property. As guardian, she was tasked with identifying and gathering Gustave's assets. She found two accounts at Wells Fargo, two accounts at Capital One, and two pieces of property (the two houses). The two accounts at Wells Fargo had between $260,000 and $270,000; the Capital One accounts had between $770,000 and $780,000. Each month, Gustave's income—consisting of a pension, Social Security, and another small payment—went into one of the Capital One accounts.

In her role as guardian, Ms. McQueen closed Gustave's bank accounts and transferred the funds into a guardianship account that only she could access. She also had an attorney at her firm draft new deeds to Gustave's properties. The new deeds, which Ms. McQueen signed as guardian and recorded in the land records for Montgomery County, re-granted Gustave his fee simple interest in the properties. She then took control of the properties only a few days before Gustave died. Ms. McQueen contacted the funeral home to settle Gustave's burial arrangements.

---

[14] "Dysphagia" is "[d]ifficulty in swallowing." *Stedman's Medical Dictionary* 599 (28th ed. 2006).

## I. Additional Financial Evidence

In addition to the testimony set out so far, several other State's witnesses focused more directly on financial issues.

### 1. Tax Preparations

Natalie Bernal, a certified tax preparer, prepared taxes for the Molinas, who filed jointly, as well as for Gustave. Javier never accompanied Ana or Gustave to Ms. Bernal's office, so Ms. Bernal never met him. Ana never reported any income. Ms. Bernal recounted that Ana would sign Javier's name for him on their tax documents. Ms. Bernal remembered that the Molinas' taxes reflected Javier's gambling losses; Ana also gambled, but she told Ms. Bernal that she had better luck gambling than her husband did.

Ana would also bring Gustave to Ms. Bernal's office to prepare his tax filings. According to Ms. Bernal, Gustave was alert and appeared aware of what he was doing during these interactions. Ms. Bernal related a few instances relevant to the relationship between Ana and Gustave. For instance, in 2013, Gustave told Ms. Bernal, when Ana wasn't in the room, that he hoped that when he passed away Ana wouldn't be stupid with his money. The next year, Ana told Ms. Bernal that she couldn't wait for Gustave to pass away because he had already lived his life and it was her turn to live her own. Then, in 2016, Ana went by herself to do Gustave's taxes for 2015. She told Ms. Bernal that she didn't bring Gustave because his dementia had made him more difficult to handle.

### 2. Financial Investigation into the Molinas

Mr. Wortman, the special investigator with the State's Attorney's Office who, at the request of APS, investigated the financial exploitation of Gustave, outlined the findings of

his investigation at trial.[15]  Mr. Wortman reviewed all Gustave's financial records from the end of 2011 through 2016, as well as accounts in the name of Ana, the Molinas' daughter Janesse, and Javier—although he said there were not many financial records for Javier. The following reflects the results of Mr. Wortman's findings.

In 2012, Gustave did not have a debit card and did not make cash withdrawals; he only wrote checks to himself at the teller's window to get cash from the bank.  After 2012, Gustave continued to write checks out to himself, but the amount of the checks increased. An "explosion in regular cash withdrawal[s]" began in January 2013 lasting through September 8, 2016.  During that period—in addition to the $398,937.86 to purchase the Wilton Oaks house and $50,000 for the Toyota Highlander—over $600,000 was withdrawn in cash and checks across two of Gustave's Capital One accounts.  Mr. Wortman noted that this was the same period during which Gustave's Capital One account reached a peak amount of  about $1.9 million as a result of deposits from matured treasury bonds.

In addition to money withdrawn by cash or checks, Mr. Wortman identified other spending during that period.  For instance, money from Gustave's accounts was used to pay $64,219.45 to New York School of Visual Arts and $52,620 for contractors to remodel the two houses.  Cross-referencing bank records and surveillance footage, Mr. Wortman was able to identify Ana using a debit card linked to Gustave's account to make several purchases at Home Depot.

---

[15] On motion from the State, the court accepted Mr. Wortman as an expert in financial crimes analysis.

The investigation into the Molinas' personal accounts also reflected increased transactions around the time Ana began working for Gustave. Ana had a checking account at Capital One that she held jointly with Janesse. The Molinas would regularly deposit into this account the paychecks from Javier's job and checks from Ana's housekeeping jobs. In 2012, there was $49,222.34 of deposits made into the account and $47,310.96 of expenditures drawn from the account. For 2013, the deposits increased to $128,454.15 and the expenditures increased to $125,879.25. Similarly, in 2014, the account reflected $120,982.41 in deposits and $119,776.83 in expenditures.

Two debit cards were associated with the Capital One account. One of the two debit cards made withdrawals from ATMs nearby Maryland Live Casino and Hollywood Casino at Charles Town Races. That debit card was used to withdraw $13,769 near the casinos in 2012. The amount of withdrawals by the two casinos increased to $22,541 in 2013 and $15,564 in 2014. The amount decreased to $9,606 in 2015 and $1,514 in 2016.

A separate account in Janesse's name had a balance of $37,142 as of June 30, 2016.[16] Deposits from Janesse's jobs in New York tended to be only about $100 or $200. Come September, Janesse made three separate cash withdrawals from the account, totaling $19,000. The balance by the end of September was $10,004.21.

---

[16] Ms. Smith testified at trial that, sometime after Gustave was removed from Ana's care, Ana called her and claimed that she had $30,000 hidden in an account in her and her daughter's names that her husband didn't know about. Ana also said she had "all of his jewelry."

### 3. Tax Returns and Gambling

Elizabeth Boone, a staff attorney with the Maryland comptroller's office, testified as a State's witness after retrieving the Molinas' tax records for trial. The Molinas' Maryland tax records from 2012 through 2015 reflected that they filed jointly and that only Javier had W-2 forms—there was no income listed for Ana, individually. Other than Javier's W-2s from the car wash where he worked, the only other income listed was in the form of W-2Gs—tax statements generated when a player cashes out winnings over $1,200. The Molinas' combined adjusted gross income for the years that Ms. Boone collected was:

- 2012: $31,833;
- 2013: $34,643;
- 2014: $47,848;
- 2015: $68,927.

The State called two employees from the casinos at which Javier had a player's card. The first of these witnesses was Ashley Pointer, a representative of Maryland Live Casino. She explained that the casino issues rewards cards, called "player's card[s,]" to its customers so that customers can earn rewards based on the amounts they gamble at slot machines or card tables. To get a player's card, customers submit their driver's license to allow the casino to verify their address. The first time Javier used his player's card at Maryland Live was May 16, 2013.

Maryland Live records a patron's winnings any time the player wins a jackpot. Ms. Pointer explained that Maryland Live uses software called "TinCheck" that verifies the name, social security number, and address that a patron provides whenever that patron wins a jackpot. When the patron wins a jackpot, the patron must present identifying information

matching that from TinCheck in order to receive their winnings. Through Ms. Pointer, the state was able to admit copies of W-2Gs and win-loss statements for Javier. Win-loss statements contain a report for the year based on gambling done with a player's card. The reports reflect how much the patron earned in money and credits and how much they actually cashed out, as well as win-loss calculations for the year and any W-2Gs that had generated that year.

Javier's annual win-loss statements for 2013 through 2016 show the following 'dollars in'[17] and losses for Javier:

- 2013: $17,339.60 dollars in, $2,205.76 in losses.
- 2014: $123,318.15 dollars in, $12,565.00 in losses.
- 2015: $278,167.81 dollars in, $40,719.84 in losses.
- 2016: $369,774.20 dollars in, $44,214.32 in losses.

The win-loss statements reflect that gambling at Maryland Live on Javier's player's card stopped on September 8, 2016, the same day that debits from Gustave's Capital One account also stopped.

There were no win-loss reports for Ana; although there were several W-2Gs spanning from 2014 through 2016 that reflect her winning several thousands of dollars in jackpots. Ms. Pointer explained that, although the casinos do not prefer it, a customer can gamble with someone else's player's card. The wins and losses generated by that customer

_____

[17] Ms. Pointer explained that the 'dollars in' figure is the amount a player physically puts into the machine plus money won and any credit the player may be using. So, if a player gambles $50 and wins $100 (the original $50 plus an additional $50 in winnings), then decides to gamble the $100, a report of the player's 'dollars in' would reflect $100. Additionally, if the player has $15 in "free slot play" on their player's card, the player cannot cash out that $15 and can only play it. The machine tallies that $15 as "dollars in." The machine does not distinguish between types of cash in.

would be reflected on the records of the player whose card is used; although, regardless of whether a customer used another player's card, or no player's card at all, a customer who wins a jackpot over $1,200 must still verify her own identity.

The second casino employee was Ronnie Little, the Director of Finance at Hollywood Casino at Charles Town Races in Charles Town, West Virginia. Hollywood Casino had one W-2G for Ana but no other records, indicating that she was not using a player's card at that casino. A Hollywood Casino records search from 2011-2016 for Javier showed W-2Gs from 2013, 2015, and 2016. There was no W-2G for 2014, meaning he never won a jackpot over $1,200 at Hollywood Casino that year. Javier's annual losses at Hollywood Casino were as follows:

- 2011: 19,956.46
- 2012: 14,216.28
- 2013: 24,813.30
- 2014: 24,230.07
- 2015: 21,418.67
- <u>2016:  4,516.86</u>

Total:  $109,151.64

### 4. Stipulation

Without waiving prior objections to evidence about the Molinas' financial status, defense counsel for Javier and Ana agreed to the following stipulation that was read to the jury:

> The Molinas first moved into the high rise building in 1992. In 1996, the Molinas moved to a three[-]bedroom apartment[.] . . . This is a garden style building. They remained in the same apartment until October of 2015. . . . The Molinas lived in this apartment with their three children. . . .

In 2010, the Molinas paid $484 per month in rent. Their rent remained at $484 per month until they moved out in October of 2015. From 2009 to 2014, Javier Molina listed his annual income as $20,800 on leasing documents. Ana Molina listed that she had no income each year.

## J. Motions for Judgment of Acquittal

At the close of the State's case, Ana moved for judgment of acquittal. She argued, in large part, that the State failed to adduce evidence that Ana exerted undue influence over Gustave's ability to make decisions based on his own free will. In response, the State asked the court "to consider both the testimony of [Gustave's] cognitive decline across the years in connection with the different financial decisions, in quotation marks, that he made throughout the years." The State argued that Gustave's cognitive impairment made it "a lot easier to show undue influence," and that there was no evidence that Gustave "knowingly and willfully consented to all of these financial transactions." As for the conspiracy charges, Ana argued that the State failed to adduce evidence "of two separate agreements between the same two people on the same day to take the property from the same victim." The State responded that the increase in Javier's gambling "circumstantially [came] from [Gustave's] account, money that comes from [Ana] who is[] the person orchestrating [the] whole affair." Finally, on the theft scheme counts, the State asserted that it was "arguing theft under unauthorized control of property as it pertains to Ana [], as well as theft by deception[,]" and relying on similar arguments to the counts of financial exploitation. The court denied Ana's motion as to all counts. The court noted, however, that it might revisit the motion for judgment on the conspiracy counts based on duplicity.

Javier also moved for judgment of acquittal. His counsel argued that "[t]here [wa]s simply no testimony putting my client in the same room ever with Gustav[e.] . . . [T]here's never any testimony that he exploited him. . . . [And] there's no testimony he used deception, intimidation, undue influence." Although he admitted that there were "some gambling records showing that he may have used some of Gustav[e]'s money to gamble[,]" Javier reasoned that his gambling proved only the recent possession of stolen goods. Javier also agreed with the court that there was evidence of him enjoying the benefits of the vehicle and the house, but he argued that "there's no action showing that he [was] involved in exploiting or deceiving [] or manipulating, there's none. He's benefiting, there's no question." The State responded by pointing to the evidence showing that Javier's increased gambling coincided with the increased money in the Molinas' bank accounts and observed that "there is no evidence at all . . . that [Javier] believed that his wife just got this $1 million job and all of a sudden she became a $1 million housekeeper." And, the State argued, Javier met the definition of an accomplice to Ana's crimes through his "participation in at least the two key events, the purchase of the car and the purchase of the house[.]" The court denied Javier's motion with respect to Counts 1 and 2 for theft scheme and conspiracy to commit theft scheme but reserved on Counts 3, 4, and 5, all of which related to financial exploitation.

### K. The Defense

Ana called one witness in her defense, Mulvina Pauline Crossman, a registered nurse case manager with Kaiser. Ms. Crossman recounted her interactions with Gustave. She testified that Gustave did not want the hospital to contact Dana, and that Gustave

41

agreed to buy a house to live in with the Molinas. In 2015, Ms. Crossman told APS that Gustave "was in his right mind" based on having known him since 2013. It was not until 2016 that Gustave's soundness of mind declined, according to Ms. Crossman. On cross-examination, Ms. Crossman testified, without objection, that her opinion of Gustave's condition would have changed if she knew more facts.

Javier called no witnesses so, following Ms. Crossman's testimony, the defense rested their cases.

## L. Renewed Motions for Judgment

The Molinas both renewed their judgments for acquittal. The court ruled that there was sufficient evidence for a fact-finder to conclude that Ana was guilty on the counts with which she was charged and denied her motion.

As for Javier, the court ruled, with respect to theft and conspiracy to commit theft:

> I comm[en]ted yesterday that there was more than enough evidence at that point to go forward on the theft and conspiracy to commit theft on the theory of receiving stolen property alone. And, if we merely look at the gambling expenditures in two different establishments, i[n] amounts [that] yearly equal more than his take-home [pay]. I say that because there's two different casinos going on.
>
> * * *
>
> . . . [I]s there a debt [from the years before Gustave]? I don't know. But, he's spending more money than his take-home. I don't know what his take-home is, but I know what his gross pay is. And, until that last year where it's 68,000, it's in the 30 and 40,000 [range], $38,000, something like that. And, somehow this family's supposed to survive on his salary. She makes [$]100, $300 here and there doing housecleaning. But, it's impossible to find that I should grant a judgment of acquittal on just the mere amounts of money that were being used to fund this pastime of gambling. And, the wife's [gambling], too. . . .

Then, the court turned to financial exploitation:

. . . At first blush, it's like, well, what evidence do we have of Javier Molina other than he's titled on the car and two houses?

And, I think the key word . . . to look at was [] did the defendant knowingly and willfully obtain property of Gustav[e] Shapiro? Maybe. That the defendant had the purpose of depriving Gustav[e] Shapiro of the property? Maybe. That at the time of the conduct, Gustav[e] was [over] 68.

\* \* \*

And, that the defendant knew or reasonably should have known that Gust[ave] Shapiro was at least 68, [] and the property had value. The more troublesome element is . . . that the defendant did so by deception, intimidation, or undue influence. And, that's the key part that defendant, Javier Molina, rightfully argues.

**But, then you look at the definition of accomplice where it says that the defendant doesn't have to be present in order to be convicted. But, that it would have to have occurred with Javier Molina doing so with the intent that the crime of financial exploitation happened; that he knowingly aided, counseled, commanded, or encouraged the commission of the crime; or communicated to a participant that he was ready, willing, and able to lend support. But, the keywords are aided, or rather, counseled, or commanded, or encouraged the commission of a crime.**

And, when you look at the sheer overwhelming evidence of the amounts of money that are going to the Molina family, when before it was a – I don't want to – it was a lower income [family,] when you consider the fact that there is a wife who's making not too much money, and there are three dependents.

Now, here you have evidence that they're living in, and have been for some long time, in housing, three-bedroom apartment, where the rent is like $460 a month. That's extraordinary. And, then the next thing you know**, in 2015 we have a house paid free and clear with his name on it, a car which is not tricked out in a way that would work for Mr. Shapiro. It's totally unsuitable for his needs and a fancy car at that, a nice one, a $41,000 car, cash. And, I note that on the car purchase Mr. Molina's name is first.**

**We also have Mr. Molina's name on the deeds. We have the increase in gambling. He benefited from this house free and clear. He benefited from the car free and clear.** There's brand new appliance[s] in the home. There's $18,000 worth of supply and remodeling. We have evidence of increasing d[ementia]. Now, I know the Defense pitch is he was doing fine, and that's really a jury consideration.

We have, okay, starting in 2013, we have the daughter going to an expensive college in New York. I mean, the jury's free to believe that Mr. Shapiro wanted to do that on his own freewill given that he had this new family. When you factor in that he didn't even pay for Dana Shapiro's college, admittedly that was many, many years ago when he had less money

no doubt, and now Mr. Shapiro's got a lot of money, you know, I just think it's one thing after another.

**And, the combination of the largesse that is bestowed upon this family in addition to Mr. Shapiro's aging process, we have APS involvement [] several times. He may not have known any of it, but we have several points when APS is starting to get involved.**

**They're moving into a house that clearly does not meet Gus[tave]'s needs. And, admittedly, at this point, he's 98.** And, maybe they just thought we'll just suck it up until, he's not going to live long. He doesn't get around.

**The real estate agent, Colleen Connor, said she had some dealing with Mr. Molina. And, this was a house paid in cash. No loan. He had to have known. I mean the jury could infer from the evidence that Mr. Molina knew that this man was vulnerable.**

And, **in the Court's view, there is sufficient circumstantial evidence to present the charges of financial exploitation on the accomplice theory that he may have encouraged his wife to commit these acts of theft, or these alleged acts of theft, or financial exploitation.**

But, really, it's based on, and **we have evidence that in 2009**, there's an MRI, and the reasons are memory loss. You don't just get an MRI for nothing. And, in 2014, he's diagnosed with mil[d] dementia. And, then we have little incidents of him acting up here and there.

And, I just think it's **the overwhelming amounts of money and gifts, if the defendant's theory is correct, [ ] support[] sending this case to a jury as I find that a reasonable fact-finder could find that Mr. Molina was an accomplice to the financial exploitation** that may have been occurring in [] that household.

So, for all of those reasons, the motion for judgment of acquittal as to all five counts is denied.

(Emphasis added).

## Verdict and Sentencing

The jury found Ana guilty of:

- a theft scheme over $100,000
- conspiracy to commit the theft scheme;
- financial exploitation of an adult over 68 in an amount over $100,000;

- conspiracy to commit financial exploitation of a vulnerable adult in an amount over $100,000;[18]
- financial exploitation of a vulnerable adult in an amount over $100,000; and
- two counts of misappropriation by a fiduciary.

The jury found Javier guilty of:

- a theft scheme over $100,000;
- conspiracy to commit the theft scheme;
- financial exploitation of an adult over 68 in an amount over $100,000;
- conspiracy to commit financial exploitation of a vulnerable adult in an amount over $100,000; and
- financial exploitation of a vulnerable adult in an amount over $100,000.

The court sentenced the Molinas on January 29, 2018. In Ana's case, for the conviction for theft scheme and two convictions for financial exploitation, the court imposed three concurrent sentences of 20 years and suspended all but 10 years. The conspiracy convictions merged into their related substantive offenses. Additionally, the court imposed concurrent suspended five-year sentences for both counts of misappropriation by a fiduciary (as well as and a concurrent suspended 10-year sentence for fraud against the government). Ana was further ordered to complete five years of supervised release and pay $60,000 in restitution. The court also prohibited her from working as a caregiver in the home of any person over the age of 68.

Javier received three concurrent sentences of 20 years with all but six years suspended for his convictions for theft-scheme and the two counts of financial exploitation. The two conspiracy convictions merged into the respective substantive offenses. Javier

---

[18] As noted earlier, one of the two charges against Ana and against Javier, of conspiracy to commit financial exploitation of a vulnerable adult in an amount over $100,000, was nolle prossed.

was also ordered to complete five years of supervised release and pay $60,000 in restitution to Gustave's estate.[19]

Ana noted her timely appeal on February 9, 2018;[20] Javier noted his own timely appeal on February 13.[21] We supply additional facts in the discussion as necessary.

---

[19] On December 4, 2017, Javier pleaded guilty to theft scheme over $10,000 against the Department of Housing and Urban Development (Count 7), for which the court sentenced Javier to an additional sentence of 10 years with all but five suspended, to run concurrently. With the State's agreement, at a hearing on November 9, 2017, the court dismissed Counts 9, 10, and 11 related to housing fraud. The State nolle prossed all remaining counts.

[20] As we noted in our introduction, we have consolidated the issues that the Molinas presented individually in this consolidated appeal. Ana's questions presented, as listed in her opening brief, are as follows:

    I.     Did the trial court err by admitting impermissible opinion evidence by a witness who was not qualified as an expert under Md. Rule 5-702?

    II.    Did the trial court err by admitting into evidence unduly prejudicial evidence of other crimes under Md. Rule 5-404(b)?

    III.   Did the trial court err by overruling the Defendant's objection to the rebuttal closing by the State?

Ana then filed a supplemental Appellant's Brief with this Court, in which she added a fourth issue:

    IV.    The evidence was legally insufficient to sustain Appellant's conviction under Section 8-801 of the Criminal Law Article of the Md. Code.

[21] In his brief, Javier presented the following questions for our review:

    I.     Was the evidence insufficient to sustain all of the convictions?

    II.    Did the circuit court err in admitting irrelevant and unfairly prejudicial evidence?

    III.   Did the circuit court err in instructing the jury on accomplice testimony?

    IV.   Did the circuit court err in permitting impermissible rebuttal argument?

# DISCUSSION

## I.

## Evidence of Gambling and the Molinas' Financial Status

### A. Motions in Limine

As mentioned earlier, the Molinas moved in limine to exclude evidence of their gambling activities and financial circumstances. At a pre-trial hearing, Javier's counsel argued that, "[o]nce the[ jury] start[s] thinking about gambling and the money being lost on gambling, and once [the State] comes with these documents and charts that show gambling, gambling, gambling, no one is going to hear anything else. Of course they stole that money. They did it to gamble. Does it prove they stole the money? No." The court inquired, "But is it not a motive?" Javier's counsel responded that the gambling evidence was prejudicial, and that the jurors would be unable to judge the case fairly because

> Once the[ jury] hear[s] that, the[ defendants are] not going to be judged fairly. **Agreed that there is** *some* **relevance to it if you're saying it's motive**, but . . .
>
> * * *
>
> . . . [w]e don't believe it proves that they did this crime, and we think it's just inflammatory, and while it makes everyone uncomfortable, and it makes everybody feel sick to think, God, was that money stolen to gamble? Was it? **It's too speculative.** It could have been stolen for many other reasons, and it basically damns[] the clients.

The State pressed that the gambling records were relevant to show motive, "because there's no other source from their own income to be able to gamble with." The gambling evidence was also relevant to a fundamental element of the theft crimes charged—where the money went. The court ruled that evidence of gambling would be permitted to show motive.

47

At the beginning of the proceedings on November 13, the court resumed consideration of the other issue addressed in the Molinas' motion in limine—financial status. The Molinas asserted that evidence of their financial status related solely to "the general and impermissible assumption that lower income people, who rely on public benefits, crave money and will commit a crime to obtain it." They added that, when combined with the gambling evidence, the evidence of their financial status "becomes overwhelming for the jury. Here's poor people and they gamble, they must have [] taken this money." The State urged that the Molinas' financial circumstances, including Ana's declaration of no income, was directly relevant to whether they had motive to steal money from Gustave in order to support their significant gambling habits.

After hearing the parties' arguments, the court decided to permit the State to admit the Molinas' joint Maryland tax returns and evidence of the couple's gambling activities. The court also indicated that it would allow testimony regarding the Molinas' rent payments and Ana's certifications of no income.[22] In lieu of such testimony, and without waiving their objections presented in the motions in limine, the Molinas agreed to the stipulation set out above.

---

[22] Ana signed several certifications of no income on HUD forms during the relevant period of time. The State maintained that it did not intend to use this evidence to show that the Molinas were lying unless they testified – the evidence was purely to show motive.

After hearing objections from the lawyers representing the Molinas, the State offered to "sanitize the HUD issue" through testimony from Tiana Wardell, an employee of Rock Creek Terrace Apartments. The court ruled that the State could ask Ms. Wardell about the rent that the Molinas paid and what Ms. Molina certified as to her income. The court reasoned that Ms. Wardell's testimony would "take out any need to bring up Section-8 housing or subsidized housing[.]"

## B. Parties' Contentions on Appeal

Before this Court, Javier contends that the trial judge committed reversible error by admitting evidence of gambling and financial status to show motive because such evidence "was irrelevant, [] unfairly prejudicial, and relied on crude stereotypes." Javier asserts that "[w]ithout resorting to stereotypes," his financial status or that of his family "did not make it more likely than not that he would have a motive to commit the offenses." To demonstrate the lack of probative value, Javier points out that his gambling activities predated Ana's employment with Gustave, "and, in any event, it does not follow that [his] gambling meant that he was an accomplice or even a co-conspirator." Citing *Vitek v. State*, 295 Md. 35 (1982), Javier posits that with few inapplicable exceptions, "evidence of a defendant's lack of financial wealth may not be introduced at trial." He maintains that any marginal relevance was substantially outweighed by the "immense" danger of unfair prejudice that the jury might conclude that he was guilty "just because he was gambling large sums of money" or because his family received government subsidies.

The State seeks affirmance of the circuit court's discretionary ruling that the probative value of the evidence outweighed its prejudicial effect. In the State's view, "special circumstances" existed, *Vitek*, 295 Md. at 41, that made the Molinas' financial status relevant and admissible. Evidence of the couple's financial circumstances, coupled with the gambling evidence, was relevant to show that Javier "was aware that money well in excess of the couple's stated income was available to fund his gambling activity," and Javier's "lack of candor on his tax returns and income statements was relevant to show a guilty conscious." The State concludes that the circuit court properly exercised its "very

broad" discretion in determining that the probative value of this evidence outweighed any unfair prejudice—particularly because the court instructed the jury to "perform their duty without any bias or prejudice to any party."[23]

Javier replies that there is no evidence in the record to support the notion that he knew or had reason to know that money he gambled was obtained unlawfully. Javier also rejects the idea that the tax documents evince a lack of candor given that testimony showed Ana prepared the taxes and signed on his behalf. Regardless, he adds, "it would still be unclear" how filing a false tax return would show consciousness of guilt in this case.

### C. Gambling and Finances: Special Circumstances

Relevant evidence is that which "tend[s] to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. The Court of Appeals has instructed that

---

[23] The State contends that Javier waived his argument that the gambling evidence was irrelevant when he conceded at trial that the gambling evidence was relevant to show motive. Javier maintains that "the defense did not exactly concede the issue of relevance. Rather, defense counsel argued that even if the evidence was relevant, the probative value was outweighed by the danger of unfair prejudice." Regardless, he contends, "the issue of the relevance of the gambling evidence was 'decided by the trial court' and therefore preserved as an issue to review on appeal."

We will ordinarily address only those issues that were raised in or decided by the trial court. Md. Rule 8-131(a). Javier's objection to the relevance of the gambling evidence was both raised and decided below. Even if, during his argument, Javier's counsel suggested that the evidence may have *some* relevance to motive, he maintained that the evidence was "too speculative." We cannot say this was an affirmative waiver by trial counsel. Regardless, we are well within our discretion to address the merits of Javier's contention that unfair prejudice outweighed *any* relevance the evidence may have had. *See Dolan v. Kemper Indep. Ins. Co.*, 237 Md. App. 610, 626 (2018) (exercising discretion to consider an argument on appeal despite grounds to conclude the appellant waived the argument).

50

relevance has two components: materiality and probative value. *Smith v. State*, 423 Md. 573, 590 (2011) (citations omitted). "A material proposition is also called a 'consequential fact.' Materiality looks to the relation between the proposition for which the evidence is offered and the issues in the case. Probative value is the tendency of evidence to establish the proposition that it is offered to prove." *Id.* (internal citations and some quotation marks omitted). A trial court may, in its discretion, exclude otherwise relevant evidence if the court determines that "the danger of unfair prejudice, confusion of the issues, or misleading the jury" *substantially outweighs* the evidence's probative value. Md. Rule 5-403.

The "threshold determination of whether evidence is relevant is a legal conclusion" that we review without deference. *Fuentes v. State*, 454 Md. 296, 325 n.13 (2017). The trial court has no discretion to admit irrelevant evidence. Md. Rule 5-402; *Fuentes*, 454 Md. at 325. If, however, we determine that evidence was relevant, our review shifts to a consideration of whether the trial court's ruling was a sound exercise of discretion. *See Fuentes*, 454 Md. at 325 n.13.

When dealing with circumstantial evidence, as in the present case, we must bear in mind that such evidence may be just as relevant as direct evidence, and, that our cases do not require any "greater degree of certainty [] when the evidence is circumstantial than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused." *Hebron v. State*, 331 Md. 219, 226–27 (1993) (internal citations omitted). The significance of a single strand of circumstantial evidence may be unclear when isolated from the larger tapestry. *See Sewell v. State*, 239 Md. App. 571, 614 n.12 (2018). To determine relevance, then, we must not view a piece of circumstantial

51

evidence "in a vacuum, devoid of consideration of the other circumstances in the case." *Cf. Smith*, 423 Md. at 590. Accordingly, we will consider whether evidence of Javier's gambling combined with the Molinas' financial circumstances tended to demonstrate Javier's motive to commit the crimes charged, as well as whether the combined effect of the evidence was unduly prejudicial.

Javier pegs the Court of Appeals' decision in *Vitek* as controlling here and says that it supports his argument that the evidence of the Molinas' financial status was too remote and speculative to be probative of guilt. 295 Md. 35. During a robbery trial, the prosecution asked Vitek whether he had just gotten out of jail and lacked income from employment at the time of the crime. *Id.* at 38. Defense counsel objected on relevance grounds, but the trial court overruled, and the jury convicted Vitek. *Id.* at 38-39. The Court of Appeals granted certiorari to decide "whether it was reversible error for the trial judge to allow the prosecutor to question Vitek regarding his financial status." *Id.* at 36.

In its analysis in *Vitek*, the Court of Appeals relied, in part, on the Supreme Court's 1897 decision in *Williams v. United States*, 168 U.S. 382 (1897). Williams was an inspector for the Department of Treasury who worked at the port of San Francisco. *Id.* at 383-84. Charged with extorting money from persons of Chinese descent, the evidence against Williams included bank records that showed deposits of large sums of money into a bank account in the name of Williams' wife during his employment with the government. *Id.* at 391-92. The Supreme Court reasoned that "the utmost the evidence tended to show was that the accused had in his possession at different times certain sums that were deposited by him in bank to his credit or to the credit of his wife. It is to be observed that

*no sum so deposited corresponded in amount with the sums which he was charged with having extorted* under color of his office as Chinese inspector." *Id.* at 396 (emphasis added). Reversing Williams' conviction, the Court held that the evidence "did not justify the conclusion that he had, under color of his office as Chinese inspector, extorted $100 upon one occasion and $85 upon another occasion." *Id.* at 396-97.

Based on *Williams* and other similar rulings, the Court in *Vitek* determined that Vitek's unemployment and recent release from jail, "w[ere] irrelevant to the main issue of guilt or innocence and could not be used to infer motive." *Vitek*, 295 Md. at 40-41. The Court held that the prejudicial effect of the evidence outweighed any probative value because once the inference was brought out, the burden shifted to the appellant to show that he did not need money and, therefore, had no motive. *Id.* Despite this ruling, however, the Court cautioned that it was *not* laying down a *per se* rule "that evidence of an accused's financial situation is never admissible." *Id.* at 41. Instead, for such evidence to be admissible, "there must be something more than a 'general suspicion' that because a person is poor, he is going to commit a crime. We hold that while normally it is not allowable to show impecuniousness of an accused, such evidence would be admissible under special circumstances." *Id.* In Vitek's case, however, those special circumstances were not present: "The fact that Vitek was unemployed and recently had been released from jail is not evidence of a 'course of conduct' nor evidence of a 'natural tendency' to establish a motive for robbery." *Id.* at 43. Likewise, there was no evidence that indicated that Vitek had "a 'desperate' need for money." *Id.* at 43-44.

Since *Vitek* (and *Williams*, for that matter), courts throughout the country have sought to define the circumstances in which a defendant's financial status crosses the threshold from speculative, irrelevant evidence, to evidence that tends to demonstrate the defendant's guilt. For instance, just five years after the Court of Appeals decided *Vitek*, this Court found that "special circumstances" made such evidence relevant in *Knoedler v. State*, 69 Md. App. 764 (1987). Knoedler stood trial for arson and willfully setting a fire to defraud his insurer. *Id.* at 766. The State offered evidence at trial, over objection, that Knoedler's lease expired on the day his apartment caught fire, and that he was frequently late on his rent. *Id.* at 769. Other evidence showed that Knoedler's business had closed because it was not making money. *Id.*

On appeal, Knoedler challenged the admissibility of this evidence under the *Vitek* Court's ruling. *Id.* Our predecessors reasoned that "the law seems clear and uniform that, where the charge is arson, and especially where it is arson with intent to defraud an insurance company, evidence of the defendant's impecunious condition or need for money is admissible to show motive." *Id.* at 771-72 (collecting cases). Applying the rule set out in *Vitek*, this Court held that a "special circumstance" existed in Knoedler's case because "motive in these cases, where the defendant's own property is damaged or destroyed, is an important element for the State to prove, [] direct proof of motive is nearly impossible, and [] some latitude must be allowed in order to prove it circumstantially." *Id.* at 772. *See also Harris v. State*, 331 Md. 137, 163 (1993) (ruling that, when a defendant had "portrayed himself as an enterprising businessman who did not need to sell drugs," the State was allowed to use the defendant's tax returns to rebut that portrayal).

We distinguished *Vitek* again in *Morrison v. State*, 98 Md. App. 444 (1993). Morrison argued on appeal that the trial court erred by admitting evidence of his financial circumstances in a trial for murder, kidnapping, and robbery. *Id.* at 447. The evidence at trial was that Morrison worked for Cullen, an elderly woman, but quit because he felt he was underpaid. *Id.* at 448. On his way out, Morrison forged a check to himself for $2,000. *Id.* When Cullen discovered that he forged her check and it became clear that Morrison would face charges if he did not return the $2,000, Morrison kidnapped Cullen "to 'force' her to drop the charges[.]" *Id.* At the trial, the State elicited testimony from the sister of Morrison's girlfriend that Morrison was having money problems and needed money. *Id.* at 449-50.

Morrison appealed his subsequent conviction, arguing in part that, under *Vitek*, the "evidence of his need for money was irrelevant and prejudicial." *Id.* at 450. This Court began its analysis by reiterating that "evidence of an accused's financial situation is admissible under special circumstances that show a nexus between the accused's financial status and the motive for a particular crime." *Id.* Affirming the judgments against Morrison, we concluded that the evidence at issue tended to show that Morrison "committed the crimes at issue because he was unable to repay the $2,000.00 he had stolen and was unable to convince the victim to drop the charges." *Id.*

Similarly, the United States Courts of Appeal have identified circumstances in which evidence of a defendant's finances or poverty is relevant. For instance, in a 1939 bootlegging case in which Jackskion was arrested with $1,300 cash on his person, the trial court admitted evidence of Jackskion's bank balances. *U.S. v. Jackskion*, 102 F.2d 683,

55

684 (2d Cir. 1939). In rejecting Jackskion's argument that the Supreme Court in *Williams* set out a general rule against admitting evidence of financial status, the Second Circuit announced:

> [W]here a defendant is on trial for a crime in which pecuniary gain is the usual motive, evidence of the sudden acquisition of money by the defendant is admissible, even though the source of the money is not traced. . . . **[S]uch evidence may, when taken with proof of other facts, have a logical tendency to prove criminal misconduct.** The weight will of course vary, depending among other things on whether the money was kept secretively by the accused.

*Id.* (emphasis added). *See also U.S. v. Cecil*, 615 F.3d 678, 689 (6th Cir. 2010) ("[F]ollowing *Williams*, we have consistently held that sudden unexplained wealth occurring after the commission of an offense is admissible evidence." (internal quotation marks and brackets omitted)); *U.S. v. Ariza-Ibarra*, 605 F.2d 1216, 1225 n.11 (1st Cir. 1979) (adopting the view expressed in *Jackskion*); *U.S. v. Manning*, 440 F.2d 1105, 1110 (5th Cir. 1971) ("[P]roof of the unexplained possession of unusual amounts of money after a robbery, standing alone, is not competent evidence to connect the possessor with the robbery; but it becomes competent provided it is further shown that he was impecunious prior thereto."); *United States v. Kenny*, 462 F.2d 1205, 1219 (3d Cir. 1972) ("We have held that sudden unexplained acquisition of wealth at or about the time of the offense charged establishes a sufficient nexus to satisfy the rule of *Williams*[.]").

Shortly after the Second Circuit's ruling in *Jackskion*, the Court of Appeals for the Eighth Circuit announced a similar rule:

> **In short the evidence of possession of a large sum of money by the defendant immediately after a theft raises a presumption of fact that the money found is a part of the stolen money and that the defendant was**

56

**connected with the theft.** Under this general rule the foundation for the introduction of such evidence includes proof of (1) the 'impecuniosity' of the defendant just before the theft, (2) and the 'sudden accession' of wealth (3) contemporaneous with the theft.

*Neal v. U.S.*, 102 F.2d 643, 648-49 (8th Cir. 1939) (emphasis added) (citations omitted).

*See also U.S. v. Chaney*, 446 F.2d 571, 575 (3d Cir. 1971) ("The rule in this circuit is that . . . 'the sudden unexplained acquisition of wealth by an impecunious person at or about the time of a theft which he had an opportunity to commit, is competent evidence of guilt and will support . . . conviction.'" (citation omitted)).

As these cases demonstrate, there is a distinction of legal significance between offering evidence of a defendant's impecuniosity to show motive for theft, and offering evidence of a defendant's impecuniosity combined with other "special circumstances"—such as evidence that the defendant acquired money contemporaneously with the theft—to show that the money the defendant acquired was connected to the theft. *Cf. Vitek*, 295 Md. at 40-41. We cannot view the evidence in this case devoid of the greater circumstances, including evidence of the Molinas' prior impecuniosity and their gambling. *See Smith*, 423 Md. at 590.

Context, therefore, is key in verifying the relevance of the gambling and financial evidence in this case. In contrast to the single robbery at issue in *Vitek*, we have before us a complex scheme that stretched over a period of years. We focus first on the year 2013 when the "explosion in regular cash withdrawals" from Gustave's bank accounts began. In 2013, the Molinas declared $34,643 of gross income on a jointly filed Maryland tax

return.    Javier lost $27,019.56 gambling that year.[24]    Put differently, Javier's losses amounted to 78% of his family's declared gross income in 2013.    The first way the complained-of evidence was relevant, then, was to show motive—Javier was gambling beyond his means.    The second way this evidence was relevant was that it tended to show that Gustave's money was the source for Javier's gambling activities, which the Molinas' combined income could not support.    Evidence that the defendant possessed a large sum of money "immediately after a theft raises a presumption of fact that the money found is part of the stolen money and that the defendant was connected with the theft."  *Neal*, 102 F.2d at 648.

But there is more.    Looking from 2012 to 2013, the evidence also showed that Javier's gambling losses nearly doubled (from roughly $14,000 to $27,000) as Gustave's bank accounts showed an unprecedented uptick in withdrawals.    Looking forward from 2013, his losses increased to $36,795.07 in 2014 and $57,296.01 in 2015.    In other words, Javier's annual gambling losses more than quadrupled during the time Ana worked for Gustave.    Even more telling is Javier's 'dollars in' figures for the years in question.    For just those occasions on which Javier used his player's card at Maryland Live, the records show that Javier put in $17,339 in 2013; $123,318 in 2014; $278,167 in 2015; and a staggering $369,774 in 2016.

If that were not enough, the State also adduced evidence linking Gustave's money directly to Javier's gambling.  *Cf. Jackskion*, 102 F.2d at 684 (ruling that a defendant's

---

[24] This does not include the amounts Javier gambled without using his player's card.

sudden acquisition of money may be admissible in a trial in which "pecuniary gain is the usual motive . . . even though the source of the money is not traced"). Mr. Wortman, the State's expert in financial crimes analysis, testified that a debit card linked to an account bearing Gustave's name was used to withdraw money from ATMs near two casinos at which Javier had player's cards and suffered losses in amounts that his income could not support. While Ana worked for Gustave, the debit card was used to withdraw $62,994 near those casinos. In 2013 alone, when Javier lost $27,019.56 gambling, the debit card was used to withdraw $22,541 from Gustave's account. Finally, the evidence also showed that Javier's gambling stopped on September 8, 2016, the same day the withdrawals from Gustave's account stopped.

The trial court ruled the evidence was admissible because special circumstances existed to show a nexus between Javier's financial status and his motive to commit the crimes charged. "[P]articularly in this case when it is all financial. I mean, it's a financial crime, it's not a violent crime[,] it's a financial crime and I'm satisfied that special circumstances have been shown." We agree and conclude that Javier's case presents a "special circumstance" within the meaning of the rule in *Vitek*, 295 Md. at 40-41. Contrary to Javier's urging on appeal, the State did not adduce evidence of the Molinas' financial status to show that the Molinas stole Gustave's money because they were poor. The State's theory was not that poverty motivated Javier—but that gambling and greed did.

Considering together all of the "special circumstances" in this case, we conclude that the circuit court was legally correct in determining that evidence of the Molinas' gambling and financial status was relevant to the crimes charged. *See Knoedler*, 69 Md.

App. at 766. *Cf. Williams*, 168 U.S. at 396 (excluding evidence of the defendant's bank books where the "manifest object and the necessary effect" was "to cause the jury to believe that [he] had in his possession more money than a man in his condition could have obtained by honest methods, and therefore he must be guilty of extorting the two sums in question"). Although the evidence was prejudicial to Javier, the State intended for it to be prejudicial, and "[t]here is . . . no such principle protecting defendants from legitimate prejudice." *Newman v. State*, 236 Md. App. 533, 551 (2018). There must be a danger of *unfair* prejudice, and the danger "must not simply outweigh 'probative value' but must, as expressly directed by Rule 5–403, do so 'substantially.'" *Id.* at 555. We cannot say that the circuit court abused its discretion in concluding that the evidence's probative value was not substantially outweighed by its prejudicial effect. *See* Md. Rule 5-403.

## II.

### Motion to Sever

Ana offers a different theory against the admissibility of the gambling evidence at trial. She asserts that Javier's trial should have been severed from hers because his gambling activity was "unduly prejudicial."[25] She relies on cases dealing with the mutual

---

[25] Ana argues on appeal that the Court erred in "admitting into evidence unduly prejudicial other crimes evidence." We note that Ana failed to make any argument before the motions court regarding other crimes evidence under Maryland Rule 5-404(b). Even if Ana had preserved her Rule 5-404(b) challenge, we resolve that it is without merit. As we explained recently, "evidence of a defendant's other wrongs 'may be admitted if the evidence is substantially relevant to some contested issue in the case and is not offered to prove guilt based on propensity to commit crimes.'" *Winston v. State*, 235 Md. App. 540, 562 (2018) (citing *Hurst v. State*, 400 Md. 397, 407 (2007)). Such evidence may be admitted for several reasons, including "if it tends to establish motive, intent, absence of mistake, a common scheme or plan, identity, opportunity, preparation, knowledge, [] or

admissibility of evidence for separate offenses[26] to assert that, in admitting the gambling evidence, the trial judge "abdicated her responsibility to know and properly apply the applicable law in deciding the issue of severance."[27]

To the contrary, the State asserts that the court properly denied Ana's motion to sever because the evidence was mutually admissible against her and Javier. According to

---

accident." *State v. Faulkner*, 314 Md. 630, 634 (1989). Here, undisputed evidence of Javier's and Ana's gambling was not offered to prove guilt based on a propensity to gamble—it was probative of Ana's motive to exploit Gustave and take his money.

[26] The cases on which Ana relies address primarily joinder and severance of offenses, rather than the issue here—joinder and severance of co-defendants. The Court of Appeals has recently clarified that, "application of the analysis for joinder and severance of *defendants* differs from the analysis applicable to joinder and severance of *offenses* in the context of a jury trial." *State v. Hines*, 450 Md. 352, 378 (2016) (emphasis added). Ana cites, for example, to *McKnight v. State*, 280 Md. 604 (1977), which the Court of Appeals specified "applies in the limited context of joinder/severance of *offenses*." *Id.* at 366. *See also id.* at 374 ("[B]oth *Conyers* and *Solomon* involved questions of severance in the *offense* joinder context; language suggesting a *McKnight* analysis in the context of codefendant joinder was *dicta*.").

[27] Ana suggests in her briefing, as an indication of error, that the "hearing judge denied the co-defendant's motion [to sever] but then later ask[ed] for a Memorandum [briefing the issue further]." As the State points out in its brief, however, this is factually inaccurate. After denying the motion to sever and other outstanding motions, the motion left before the court was Ana's motion "to exclude testimony regarding other crimes that were severed[.]" The motion, as Ana's trial counsel explained it, was to exclude witnesses relating to her alleged crimes against HUD and DHMH because the court had severed those counts from her trial. The State, according to Ana, wanted to use evidence relating to her housing assistance to show "motive to steal money here from [Gustave]." She then argued, as Javier does now on appeal, that evidence of poverty is impermissible to show motive based on the Court of Appeals' decision in *Vitek*. It was on this issue—the applicability of *Vitek* and the admissibility of evidence relating to the Molinas' financial status—that the court requested further briefing. The court explained, "I am going to allow the State to find other cases if they want because this V[i]te[k] case just came up." The record is clear that the matter the court held in abeyance was the admissibility of evidence, not the severance of the trials. Ana does not challenge the admissibility of the financial-status evidence on appeal.

the State, the charge of conspiracy against Ana required proof of an agreement between her and Javier, and evidence of Javier's gambling "was integral to proving" the nature of the agreement, the source of the money, the absence of intent to return Gustave's money, and Ana's motive.

## A. Pre-Trial Ruling

On May 26, 2017, the court heard argument on and denied Ana's motion to sever. The court later revisited the issue at another pre-trial hearing, during which Ana focused her argument on the contention that evidence relating to Javier's gambling would unduly prejudice her. Ana pointed out that the gambling records related only to player's cards tied to Javier's name, and that she would not be able to cross-examine Javier on the source of the funds he gambled. In response, the State offered that, although there were no player's cards in Ana's name, a debit card linked to a bank account in her name was used to withdraw $60,000 from ATMs near two casinos.

The trial judge began her ruling by declaring, "I am not severing the case." She determined that the gambling evidence was relevant and mutually admissible because the Molinas were charged with being part of the same conspiracy:

> [A]ll the gambling that Javier is doing wouldn't ordinarily be admissible . . . in the case against Ana, but in this case there are three counts each of conspiracy, and [] the co-conspirator is listed as their spouse. So, in my view, a lot of the evidence, for example, Javier's gambling would be admissible as in any case against Ana because . . . she's a co-conspirator. So, in counts two they are charged with conspiracy to commit a theft, count four, conspiracy to exploit a vulnerable adult, and count six, conspiracy to exploit a vulnerable adult. So, to that extent, a lot of the evidence that wouldn't ordinarily be admissible against the other is because they are charged as co-conspirators.

[I]n both indictments, the defendants are charged three times with conspiracy with their spouse. I don't see how . . . any of the evidence would be inadmissible against the other, given the conspiracy counts. So, the court has the discretion to sever the case, and I have evaluated all the factors, read all the cases cited by you, and I am satisfied that a joint trial against both defendants is appropriate in this case. There are no[] Bruton problems.[28] If there were any, they were fixed . . . because the State is not going to introduce [Javier's] statements as to [Ana].

## B. Analysis

A trial court may, on motion by a party, "order a joint trial for two or more defendants charged in separate charging documents if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Maryland Rule 4-253(a). Subsection (c) of Maryland Rule 4-253, however, endows the trial court with discretion to order separate trials of the defendants, or to grant other relief that justice may require, "[i]f it appears that any party will be prejudiced by the joinder[.]" Our review of a trial judge's denial of separate trials, then, is to resolve whether the trial judge abused the discretion endowed by Rule 4-253(c).

The Court of Appeals clarified the appropriate analysis for joinder and severance of defendants in *State v. Hines*:

> In the context of defendant joinder, **the trial court must first determine whether non-mutually admissible evidence will be introduced and then must determine whether the admission of such evidence will unfairly prejudice the defendant seeking a severance.** If the trial judge finds that the admission of non-mutually admissible evidence will result in unfair

---

[28] In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court dealt "specifically with the Sixth Amendment Confrontation Clause rights implicated where two or more defendants are jointly tried and one of the defendants does not testify at trial but gives a statement to police that is later admitted into evidence at trial." *State v. Hines*, 450 Md. 352, 367 n.5 (2016).

prejudice, the judge must exercise his or her discretion to remove the prejudice by either granting a severance or other relief (such as redacting evidence so as to implicate only the defendant against whom the evidence is admissible).

450 Md. 352, 379 (2016) (emphasis added). *See also Winston v. State*, 235 Md. App. 540, 558-59 (2018) (applying *Hines* to the issue of joinder of related charges against multiple defendants). The issue in *Hines* arose from a joint criminal trial of two codefendants, Dorrien Allen and Tevin Hines. 450 Md. at 355. Hines appealed the court's dismissal of his motion for severance, arguing that he was unfairly prejudiced by the admission of a recorded statement Allen made to police. *Id.* at 355-57. Applying the above two-step analysis, the Court concluded that "Hines was significantly prejudiced by the actual admission of evidence that, although admissible against Allen, was inadmissible against Hines." *Id.* at 383. Though the trial judge gave a limiting instruction, the Court was "unwilling to assume the jury was able to follow the limiting instructions[.] . . . [I]t would have been practically impossible for the jurors to dismiss from their minds the statements of Allen when evaluating the evidence against Hines." *Id.* at 383-84. The Court held, therefore, that the trial judge abused his discretion in denying severance in light of the risk that the jury would fail to follow the limiting instruction. *Id.* at 385.

Turning to the first step of the *Hines* analysis, we find no error in the court's determination that only mutually admissible evidence would be introduced at trial because Ana and Javier were each charged with multiple counts of conspiracy with the other. As we just held in Section II, evidence of Javier's gambling losses was relevant evidence that tended to show that Javier committed the crimes charged. Because the State charged Javier

and Ana as co-conspirators in these crimes, the evidence was equally probative of Ana's guilt as a co-conspirator. Even independent from the conspiracy charges, however, Javier's gambling losses are probative of Ana's motive. As the court pointed out in considering the motion to sever, "evidence of gambling [] is a theory of motive, and why so much money would be missing." Ana declared no income of her own and their family of five relied largely on Javier's income. Evidence that Javier gambled away his income, therefore, was probative of Ana's motive to exploit Gustave and take his money.

Within the meaning of Rule 4-253, prejudice "is a term of art, and refers only to prejudice *resulting* to the defendant *from* the reception of evidence that would have been inadmissible against that defendant had there been no joinder." *Hines*, 450 Md. at 369 (citation and internal quotation marks and brackets omitted). Thus, in the absence of non-mutually admissible evidence, the trial judge was not required to engage in the second part of the *Hines* analysis to "determine whether the admission of such evidence will unfairly prejudice the defendant seeking a severance." *Id.* at 379. Still, the trial judge appears to have taken into consideration arguments by counsel that the gambling evidence was unfairly prejudicial. Ana presented her argument as though the gambling evidence implicated only Javier and was, therefore, unfairly prejudicial. In response, the trial judge explored Ana's direct involvement in gambling. When the court inquired, for example, whether Ana had a player's card, the State informed the court that, while there were no records of a player's card in Ana's name, Ana's Capital One account showed that a debit

65

card in her name was used to withdraw over $60,000 from ATMs near the two casinos where Javier gambled frequently.[29]

The trial judge stated on the record that she reviewed the *Hines* case, contrary to Ana's contention that she "abdicated her responsibility" to apply the applicable law on severance. *Hines* was the first opinion by the Court of Appeals to address the issue of "the application of the offense joinder analysis set forth in *McKnight v. State*, 280 Md. 604 (1977) in the context of defendant joinder." 450 Md. at 355.

Finally, we observe also that judicial economy outweighed Ana's arguments for severance. *See Conyers v. State*, 345 Md. 525, 553 (1997) (summarizing the analysis for *offense* joinder as encompassing two questions: "(1) is evidence concerning the offenses or defendants mutually admissible; and (2) does the interest in *judicial economy* outweigh any other arguments favoring severance?" (emphasis added)). The State's evidence included testimony from 26 witnesses and well over 100 exhibits. The jury was empaneled on November 13 and did not issue its verdict until November 27. Given the volume, mutual admissibility, and complexity of the evidence, we discern no abuse of discretion by the trial court in denying Ana's motion to sever her trial from Javier's trial.

---

[29] The evidence ultimately introduced at trial was consistent with the evidence before the trial judge at the pre-trial hearing that Ana was involved in gambling. Ms. Bernal, for instance, testified that Ana touted having better luck gambling than Javier. Even though Hollywood Casino or Maryland Live did not have win-loss statements associated with a player's card in Ana's name, the casinos generated W-2Gs in her name from 2014 to 2016—meaning that Ana won several jackpots over $1,200 while she worked for Gustave.

## Lay Opinion Evidence

Ana asserts that the trial court erred by allowing impermissible opinion testimony by a witness not qualified as an expert witness under Maryland Rule 5-702. The witness, Elizabeth Goldberg, was the elder law attorney who drafted the powers of attorney for Gustave in 2014. During trial, she was called by the State, but she had also appeared on Ana's witness list as a "hybrid fact/expert witness."[30] Ana challenges Ms. Goldberg's testimony that a fiduciary wouldn't be able to spend a principal's money on himself or herself. Ana also challenges Ms. Goldberg's testimony in which she related that her opinion that Gustave was competent to execute legal documents would have changed if she knew of the $300,000 transfer from Gustave to Ana or if she had been asked to add the Molinas to the deed of Gustave's home.

The State points out that Ms. Goldberg's testimony was a proper subject on re-direct because the defense, on cross-examination, first elicited Ms. Goldberg's opinion of Gustave's competency, making it reasonable for the court to allow the State to "explore the contours of Ms. Goldberg's opinion on re-direct[.]" Regardless, the State contends, any error was harmless because "Ms. Goldberg's acknowledgement that she would have considered the information included in the hypotheticals[] could not have influenced the jury's verdict in this case" because Ms. Goldberg never explained *how* that information would affect her conclusion.

---

[30] The State, in turn, notified Ana of its intention to call Ms. Goldberg as a fact witness.

## A. Motion in Limine

The State, in a motion in limine to exclude opinion testimony, pointed out that Ana's witness list included Ms. Goldberg as a potential expert witness. The State's motion related Ana's description of Ms. Goldberg's testimony:

> Ms. Goldberg will testify as to 'whether she believed that Mr. Shapiro knew what he was trying to accomplish and understood the risks and benefits of the transaction(s).' She would further 'offer her opinion as to whether, by legal standards, Mr. Shapiro appeared to understand the sequence of events and legal documents he was entering into.'

The State argued that Ana's proffered experts, including Ms. Goldberg, had not "administered any tests to determine the competence of Mr. Shapiro and none of them are qualified to do any such testing." Additionally, the State complained, Ana failed to disclose exactly what the opinion of each of the experts would be.

Ana responded that the attorney-witnesses, including Ms. Goldberg, had "specialized knowledge, training, and experience" and their expert opinions would be relevant. She asserted: "Even if these witnesses were not permitted to testify as hybrid fact/expert witnesses, *the opinion of each concerning the capacity, comprehension and exercise of free will by Mr. Shapiro would clearly be permissible lay opinion[s]* under Maryland Rule 5-701, as it is opinion testimony that is 'rationally based on the perception of the witness,' and . . . is 'helpful to an understanding of the witness's testimony or the determination of a fact in issue.'" (Emphasis added).

At the motions hearing on November 9, the court addressed the State's motion. Ana reiterated that the attorney-witnesses would

necessarily rely on their training and experience . . . in their area of practice, and all of that is beyond the k[e]n of an ordinary lay person. It's within the province of expert testimony. So, for that reason, we noted them as hybrid fact and expert witnesses. But as Your Honor pointed out, **their opinions as to Mr. Shapiro, that would be permissible lay opinion testimony in any event because it's rationally based on their perception of Mr. Shapiro.** And to the – you know, the fact that they don't have a medical background and the issues raised by the state, that goes to weight, not admissibility. **That's[] an area that can be inquired into on cross-examination.** But the opinions and assessments of Ms. Goldberg in transacting the legal services are germane to her testimony as to why [] and how these documents were procured.

(Emphasis added). The court denied the State's motion to exclude Ms. Goldberg's opinion testimony. Because the State planned to call Ms. Goldberg as a fact witness to produce documents, the court clarified that the defense would have to elicit her opinion testimony as part of their case in chief.

### B. Testimony on Duty of Fiduciary

Ana, who designated Ms. Goldberg as an expert witness, now complains that the circuit court erred by permitting Ms. Goldberg to offer an opinion on the duty of a fiduciary without having been qualified as an expert under Maryland Rule 5-702. But Ms. Goldberg did not offer any expert opinion; rather, she simply explained the scope of a fiduciary's duty. This duty was also set out in the jury instructions, which instructed the jury that "Ana Molina acted fraudulently if she intended to promote a personal interest of someone other than the person who entrusted her with the money." Additionally, several other attorney-witnesses (and even Mr. Aiyedogbon, a non-attorney) were permitted, without objection, to explain the scope and effect of various legal documents, such as a power of attorney and

revocable trust.  Any error in permitting Ms. Goldberg to testify to the basic bounds of a fiduciary relationship was, without doubt, harmless.

## C. Testimony on Gustave's Capacity

Ana's challenge to Ms. Goldberg's lay opinion testimony about her perception of Gustave's competency fails for several reasons.  First, Ana invited any error.  "Under the 'invited error' doctrine, 'a defendant who h[er]self invites or creates error cannot obtain a benefit—mistrial or reversal—from that error.'"  *Smith v. State*, 218 Md. App. 689, 701 (2014) (quoting *State v. Rich*, 415 Md. 567, 575 (2010)).  Ana asserted before the circuit court that the opinion of Ms. Goldberg (along with her other proffered attorney-witnesses) as it related to Gustave's competency "would be permissible lay opinion testimony . . . because it's rationally based on their perception of Mr. Shapiro."  Now on appeal, Ana asks us to conclude exactly the opposite.  We will not entertain her request.

Second, even if Ana had not invited the error, her argument on appeal would still fail because the State's questions on re-direct were permissible given Ana's cross-examination of Ms. Goldberg.  On cross-examination, Ana's counsel asked Ms. Goldberg whether Gustave "appeared to understand the sequence of events" and whether he understood the effect of the power of attorney.  Ms. Goldberg testified that Gustave "seemed to understand."  Ana then elicited testimony from Ms. Goldberg that she would not have attended the execution of the power of attorney had she felt that Gustave did not understand them.  It was in direct response to these questions that, on re-direct, the State asked, "If you had been told that $300,000 of Mr. Shapiro's money had already been transferred to Ms. Molina, would that have impacted your opinion about his competency

to these documents?" After the court overruled the defendants' objections, Ms. Goldberg answered, "It would, it would have been, yes, I would have taken that into account if I had known that." Then, on re-cross, Ana's counsel asked whether it would have affected Ms. Goldberg's opinion of Gustave's metal soundness if she knew that he was able to answer APS's questions during a Brief Mental Status check to show that he was oriented. Ms. Goldberg responded that it went to undue influence while the State's questions went to soundness of mind, but that she would look to both factors.

We hold that Ana's complaint that the State elicited the same brand of opinion testimony from Ms. Goldberg that she elicited on both cross-examination and re-cross is without merit. An appellant may not assert, as a ground for reversal, the inadmissibility of evidence when she elicited substantially the same evidence herself. *See Miller v. State*, 421 Md. 609, 629 (2011) (holding that the defendant's cross-examination of the State's expert witness "'opened the door' to the opinion that was elicited on redirect examination").

Finally, Ms. Goldberg's opinion testimony—even if admitted erroneously—was cumulative of opinion evidence offered by several other witnesses, rendering any error undoubtedly harmless. *See Dove v. State*, 415 Md. 727, 743-44 (2010) ("In considering whether an error was harmless, we also consider whether the evidence presented in error was cumulative evidence."). For one, Dr. Nay, an expert medical witness who examined Gustave, opined that Gustave was not competent to engage in complex financial transactions dating back to 2006. This was consistent with testimony from Dr. Dutka that an MRI of Gustave's brain in 2006 showed atrophy and white matter changes consistent

71

with dementia. Further, other lay witnesses, like Ms. Crossman, testified without objection that their opinions of Gustave's condition would have changed if they had more facts.

Accordingly, given that Ana invited any error in the first instance and subsequently opened the door to the complained-of testimony, which, in the end, was cumulative of other similar evidence, we discern no reversible error or abuse of discretion in the court allowing Ms. Goldberg's testimony.

## IV.

### Accomplice Liability

Javier contends that the evidence at trial did not generate a jury instruction on accomplice liability and the circuit court, therefore, erred in giving one. He asserts that "there is no evidence in the record supporting the inference that [he] was aware that [Gustave] had become vulnerable[.]" Additionally, Javier insists that because Gustave's lawyers signed off on the power-of-attorney, the restructuring of the deed to Gustave's home, and the modifications to his will—all transactions that involved Ana and not Javier—Javier would have had to "have 'known better' than the lawyers who determined that Mr. Shapiro had the capacity to appreciate and consent to the transfer of money and property." He points out that the trial court acknowledged that Javier "might not have known" about the APS investigations. In sum, Javier concludes that the State's case relied on conjecture rather than evidence.

In response, the State assures that it presented evidence at trial sufficient to generate an accomplice-liability instruction. This evidence included, according to the State: Javier signing the deed on the Wilton Oaks house and listing his name on the title to the Toyota

72

Highlander; Javier's "active role in purchasing the home" and "discussing renovations with the realtor"; and, the fact that Javier lived with Gustave and knew or should have known that Gustave's mental health was deteriorating as Javier "continued to enjoy the benefits of [Gustave's] funds." From the combined evidence of Gustave's vulnerability and the money going to the Molinas, the State submits that there was sufficient evidence from which a jury could conclude that Javier was Ana's accomplice.

Based on the applicable Maryland Pattern Jury Instruction (MPJI-CR 6:00), the trial court instructed the jury as follows on accomplice liability:

> A defendant may be guilty of a theft scheme and financial exploitation of a vulnerable adult as an accomplice, even though the defendant did not personally commit the acts that constitute that crime. In order to convict the defendant of these crimes as an accomplice, the State must prove that a theft scheme and/or financial exploitation of a vulnerable adult occurred **and that the defendant, with the intent to make the crime happen, knowingly aided, counseled, commanded, or encouraged the commission of the crime, or communicated to a participant in the crime that the defendant was ready, willing, and able to lend support, if needed.**
> A person need not be physically present at the time and place of the commission of the crime in order to act as an accomplice.
> **The mere presence of the defendant at the time and place of the commission of the crime is not enough to prove that the defendant is an accomplice.** If presence at the scene of the crime is proven, that fact may be considered, along with all of the surrounding circumstances, in determining whether the defendant intended to aid a participant and communicated that willingness to a participant.

(Emphasis added).

Trial courts give jury instructions to "direct the jury's attention to the legal principles that apply to the facts of the case." *General v. State*, 367 Md. 475, 485 (2002). Under Maryland Rule 4-325, in a criminal case,

> The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. . . . The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

Our courts have interpreted this rule to require trial courts to give a party's requested jury instruction when a three-part test is met: "The instruction must state correctly the law, the instruction must apply to the facts of the case (e.g., be generated by some evidence), and the content of the jury instruction must not be covered fairly in a given instruction." *Preston v. State*, 444 Md. 67, 81-82 (2015) (internal citations and footnote omitted). The second prong is at issue in this case: whether the proponent of a jury instruction (here, the State) generated the instruction factually by adducing "some evidence." *See Nicholson v. State*, 239 Md. App. 228, 239 (2018), *cert. denied*, 462 Md. 576 (2019). Some evidence is "a fairly low hurdle." *Arthur v. State*, 420 Md. 512, 526 (2011). "It calls for no more than what it says—'some,' as that word is understood in common, everyday usage. It need not rise to the level of 'beyond reasonable doubt' or 'clear and convincing' or 'preponderance.'" *Id.* (citation omitted). Our task as the reviewing court is to determine whether the proponent "produced that minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired." *Bazzle v. State*, 426 Md. 541, 550-51 (2012) (citation omitted). Because this "threshold determination of whether the evidence [wa]s sufficient to generate the desired instruction is a question of law for the judge[,]" *id.* at 550, our review is without deference.

74

We conclude that the State adduced sufficient evidence to generate the instruction on accomplice liability. Although there is no direct evidence of Javier's communications with Ana and, consequently, no direct evidence that he communicated with Ana his willingness to participate in or lend support to her crimes, the State adduced circumstantial evidence that Javier knowingly aided Ana in the commission of the crimes charged. We will begin with evidence suggesting that Javier knew Gustave was vulnerable.

When the Molinas moved into the Wilton Oaks house with Gustave, Javier's bedroom was right across the hall from Gustave's bedroom. The period in which Gustave lived with the Molinas was also the period in which Gustave suffered his sharpest decline mentally. This decline was readily ascertainable from other witnesses who observed Gustave in 2016, including Dr. Nay, Dr. Albiol, Ms. Smith, Ms. Mundle, and Ms. Libert. In fact, Gustave's situation became so dire that Ana sought help from medical specialists and in-home nursing specialists, and, at one point, had to call 911. When Officer Kujawa responded to the Wilton Oaks house, she found that the people at the house—where Javier and his family lived with Gustave—were "visibly upset by what was going on." This evidence supports an inference that Javier, who lived across the hall from Gustave, also knew of Gustave's declining mental state and increasing vulnerability.

Javier seeks to side-step the subject of his own awareness of Gustave's vulnerability by arguing that, since Gustave's lawyers failed to appreciate his vulnerability, "the State is essentially arguing that . . . [Javier] should have 'known better' than the lawyers." This argument does not hold. For one, Ms. Goldberg, who met Gustave only twice, testified that she was uncomfortable with drafting the powers of attorney and went forward with the

75

transaction only because APS closed its investigation. We also know from medical testimony at trial that Gustave's cognitive decline was not manifest at all times and that he was oriented more on some days than others—something that a person who lived with Gustave would know. Furthermore, one need not be an attorney to discern that a nonagenarian presenting with symptoms of cognitive loss might lack the capacity necessary to complete large financial transactions, such as the expenditures of $400,000 for a house and $50,000 for a vehicle for his or her part-time housekeeper. In fact, at least three non-lawyers who observed the outward signs of Gustave's cognitive decline suspected that Gustave was being exploited financially. Each of the three—Mr. Aiyedogbon, Ms. Alhalaseh, and Ms. Smith—reported the situation to APS. Javier's suggestion, that he was simply unable to discern that which was obvious to others who had much less contact with Gustave, cannot defeat the inference generated by the State's evidence that he knew or should have known that Gustave was vulnerable.

In addition to the evidence that Javier knew of Gustave's vulnerability, the State also adduced some evidence that Javier knowingly aided, counseled, or encouraged the commission of theft and financial exploitation. Javier's signature appeared on the deed to the Wilton Oaks property and the title to the Toyota Highlander, and he filed joint tax returns with Ana that omitted any declaration of income from Gustave or other individuals whose houses she cleaned. Although the State could not demonstrate Javier's presence during many of the acts by which Ana appropriated Gustave's money and property, the State adduced evidence that Javier was an active participant when the Molinas used

Gustave's money for their own personal benefit—far beyond their earning capacity—and to Gustave's detriment.

Javier viewed the Wilton Oaks house prior to its purchase. The house was not wheelchair-accessible even though Gustave—who paid for the purchase—was confined to a wheelchair and could not access either level of the house without assistance. Ana made multiple representations that the Molinas would renovate the house to suit Gustave's needs. Javier did not correct this misrepresentation; instead, he attended the closing on the sale of the property. With Gustave present, Javier signed his name to a deed that granted the Molinas' a fee simple interest in the Property subject to a life estate in Gustave, who was 98 years old at the time.

A player's card bearing Javier's name was used to gamble away more money than Javier earned, and a debit card tied to Gustave's account funded those gambling losses, at least in part. Javier would have likely noticed that his oldest child, Janesse, left to attend college in New York, with more than $60,000 in tuition costs paid with Gustave's money.

To generate a jury instruction on Javier's liability as an accomplice in Ana's crimes against Gustave, the State did not need to prove Javier's knowing participation beyond a reasonable doubt or even by a preponderance of the evidence. *See Arthur*, 420 Md. at 526. The State needed to adduce only some evidence that Javier acted as Ana's accomplice in the commission of the crimes charged. *See id.* Considering that Javier lived with Gustave during the period of Gustave's steepest cognitive decline, and that Javier was present for and benefited from the largest transactions funded with Gustave's money, the State clearly adduced more than 'some evidence' to generate the accomplice-liability instruction.

77

# V.

## Sufficiency of the Evidence Against Ana

Ana argues that the evidence was legally insufficient to support her conviction for financial exploitation of a vulnerable adult under CR § 8-801.[31]  She asserts that Gustave "was not a vulnerable adult as that term is defined in Section 3-604 of the Criminal Law Article."  She points to testimony elicited at trial suggesting that Gustave was cognitively intact in 2013 and 2014, including Ms. Goldberg's statement that she did not observe any cognitive impairment when she discussed the benefits of a Living Revocable Trust with Gustave in March of 2014.  Ana further contends that the testimony of several witnesses, including Ms. Goldberg, relating Gustave's expressed desire that Ana inherit all of his property demonstrates that Gustave knew what he wanted to do with his finances.  Accordingly, Ana insists that "there was no evidence presented by the State that [she] deceived, intimated or exerted undue influence over Gustav[e] Shapiro at any time during the period alleged in the indictment, and intended to do so."

The State responds that it adduced "ample evidence" to support Ana's conviction, including:

---

[31] Ana was convicted of both financial exploitation of *an adult over 68* under CR § 8-801(b)(2), and financial exploitation of *a vulnerable adult* under CR § 8-801(b)(1). Ana's brief on appeal challenges only her "conviction" (singular) under "Section 8-801" for "exploitation of a vulnerable adult."  Both subsections, (b)(1) and (b)(2), share in common the prohibition against "knowingly and willfully obtain[ing] by deception, intimidation, or undue influence the property of an individual that the person knows or reasonable should know is" either a vulnerable adult or at least 68 years old.

- Beginning in 2013, the systematic transfer of funds from Gustave's accounts to accounts titled in Ana's name solely or together with Gustave;

- The transfer of approximately $400,000 to purchase a house that was titled in both Mr. and Mrs. Molina's names and was not renovated to accommodate Mr. Shapiro's physical limitations;

- The withdrawal of $50,000 to buy a vehicle, though only $35,550 was paid in cash, which was never retrofitted for wheelchair access;

- Ana's tax returns and income statements that did not include the money she had taken from Gustave's accounts, the transferred assets, or information about the two houses titled in her name;[32] and

- Ms. Smith's testimony that Gustave told her Ana took all of his money.

We begin our analysis with the language of the prominent statute in this case, CR 8-801, entitled "Exploitation of Vulnerable Adults Prohibited." Section § 8-801(b)(1) provides: "A person may not knowingly and willfully obtain by deception, intimidation, or undue influence the property of an individual that the person knows or reasonably should know is a vulnerable adult with intent to deprive the vulnerable adult of the vulnerable adult's property." We have already noted that a vulnerable adult is "an adult who lacks the

---

[32] As noted, Ana did not declare any income on her Maryland tax returns, even though there was testimony that she received payments for cleaning houses, including Mr. Flynn's and Mr. Flynn's mother's, and substantial sums from Gustave. Ms. Bernal, the tax preparer who completed the Molinas' joint returns and Gustave's returns during the years he knew Ana, did not testify, nor was she asked, whether she had completed any gift tax returns (IRS Form 709) for any of the sums Ana received from Gustave. There is no evidence in the record that Gustave filed any gift tax returns.

physical or mental capacity to provide for the adult's daily needs."  CR § 3-604(a)(10).

Deception, as defined in CR § 7-101(b)(1), means, among other things, to knowingly:

> (i) create or confirm in another a false impression that the offender does not believe to be true;
> (ii) fail to correct a false impression that the offender previously has created or confirmed;
> (iii) prevent another from acquiring information pertinent to the disposition of the property involved;
> \* \* \*
> (vii) promise performance that the offender does not intend to perform or knows will not be performed[.]

Undue influence is "domination and influence amounting to force and coercion exercised by another person to such an extent that a vulnerable adult . . . was prevented from exercising free judgment and choice."  CR § 8-801(a)(6)(i).

In addressing Ana's challenge to the sufficiency of the evidence, we first ascertain the essential elements of CR § 8-801, and we then review the evidence presented at trial in the light most favorable to the State to determine whether "*any* rational trier of fact could have found the essential elements of [CR § 8-801] beyond a reasonable doubt."  *Painter v. State*, 157 Md. App. 1, 10-11 (2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  A conviction may rest on circumstantial evidence alone "when the circumstances, taken together, do not require the trier of fact to resort to speculation or mere conjecture."  *Morgan v. State*, 134 Md. App. 113, 124 (2000) (citation omitted).  "[C]ircumstantial evidence does not 'depend upon one strand, but is made up of a union and combination of the strength of all its strands.'"  *Sewell*, 239 Md. App. at 614 n.12 (quoting *Hebron v. State*, 331 Md. 219, 228 (1993)).  Therefore, a fact-finder need not be "satisfied beyond a

reasonable doubt of each link in the chain of circumstances relied upon to establish the defendant's guilt." *Id.* (citation omitted).

We handily discard Ana's contention that there was no evidence of Gustave's vulnerability. Expert medical testimony was presented at trial that Gustave suffered from dementia as far back as 2006. Dr. Dutka explained at trial that even mild senile dementia affects the "instrumental activities of daily living[,] which include things like managing finances, taking care of appointments, [] stocking the refrigerator and doing other things around the home." Ana was with Gustave at his neurologist appointment when Gustave was formally diagnosed with dementia in 2014. Ana was aware of Gustave's diagnosis because she told Ms. Alhalaseh about it in 2015 to explain why she stopped bringing Gustave to Capital One. Earlier, Ana told the real estate agent that she would have to put a chair lift in the house on Wilton Oaks Drive, which she purchased with Gustave's money, to accommodate Gustave's disabilities. By 2016, Gustave's symptoms were so severe that he scored a five out of 30 on the daily-living assessment.

Aside from the formal diagnosis, Ana was also with Gustave at several other appointments, demonstrating that she knew or reasonably should have known that Gustave was vulnerable. For instance, in 2014, Ana was present for a discussion with Dr. Hurley about moving Gustave to an assisted-living facility. Less than two years later, Ana reported to Dr. Hurley that Gustave was becoming "increasingly difficult to manage" and "requir[ed] more intense assistance with his normal daily activities." Taking this evidence together, we conclude that there was more than sufficient evidence to prove that Gustave was a vulnerable adult. There was also sufficient evidence from which a reasonable fact-

81

finder could conclude that Ana—who took Gustave to his doctor's appointments, administered his medications, was informed that he suffered from dementia, lived in a house with him, and promised to retrofit the house and the car to accommodate his disabilities—knew or should have known that Gustave was a vulnerable adult.

Turning to the financial exploitation component of CR § 8-801(b)(1), we are guided by Maryland's seminal case on what constitutes the exploitation of a vulnerable adult— *Tarray v. State*, 410 Md. 594 (2009).

The vulnerable adult in *Tarray* was John Wright. *Id.* at 599. Unlike the debilitating cognitive condition that Gustave suffered from, Wright's vulnerability resulted from paralysis that he suffered from his waist down. *Id.* at 600. Wright was "relatively independent, in the sense that he worked full time from home for a defense contractor[,]" but he needed help with daily activities from a caregiver "with medical expertise and knowledge about how to care for someone in his physical condition[,]" including the maintenance of his catheter. *Id.* Wright hired Tarray, who represented that she was a licensed practical nurse, at a salary of $350 per week. *Id.* Although Tarray's employment would last for six months, in that time, Tarray demanded and received three separate raises, which brought her salary to $1,000 per week, all of it untaxed. *Id.* at 600-02. Additionally, without Wright's knowledge, Tarray opened three bank accounts in his name and used one account to make several cash advances. *Id.* at 602. At trial, Wright would testify that he agreed to the raises "[b]ecause . . . [he] was between a rock and a hard place." *Id.* at 601. Wright would also buy Tarray a new truck that he was physically unable to ride in himself "in the hope that she would continue working for him." *Id.*

During the six months that Tarray worked for Wright his condition deteriorated and so did the level of care Tarray provided. *Id.* at 602. Tarray often left Wright by himself when he needed care, and her insufficient cleaning of his catheter led him to be hospitalized three times for infections. *Id.* The third hospitalization occurred two days after Wright finally fired Tarray. *Id.* Tarray visited Wright in the hospital and brought documents for him to sign that, respectively, gave her title to the truck and the right to live in his house during his hospitalization. *Id.* at 602-03. Wright explained at trial that he felt obliged to care for Tarray until she got back on her feet because she worked for him, and he is a very caring person who "always tr[ies] to take care of everybody[.]" *Id.* at 603. Tarray moved at trial for judgment on the charges relating to financial exploitation, arguing that there was no evidence to support a finding of undue influence. *Id.* The court denied the motion, and the jury convicted Tarray of those charges and others. *Id.* at 604.

On appeal, Tarray challenged the legal sufficiency of the evidence on the grounds that she never forced nor coerced Wright and his free will was never overborne, although, she conceded that Wright was a vulnerable adult. *Id.* at 605, 611. According to Tarray, "the evidence did not suggest that she obtained Wright's property by any one of the three modalities described in the statute[:]" deception, intimidation, or undue influence. *Id.* at 606; CR § 8-801(b). The Court of Appeals agreed with Tarray that "the evidence was insufficient to support the conclusion that Tarray unduly influenced Wright, causing him to relinquish his property." *Id.* at 612. The Court reasoned that, although Wright's decisions "may seem unreasonable, [] his testimony show[ed] that he did so because of his

83

own judgment rather than 'force and coercion' to the extent that a vulnerable adult could not exercise his or her free will." *Id.* at 611.

As for deception, however, the Court held that "at least two separate instances involving Tarray's deceptive conduct" were "sufficient to support the jury's conclusion that Tarray obtained the vulnerable adult's property by deception." *Id.* at 615. The two false impressions that Tarray created in Wright and then failed to correct related to her pay: (1) she drafted a paycheck from a bank account she opened without authorization and misled Wright into believing the check was written on a different account; and (2) she created the impression that she was deducting payroll taxes from her paycheck on Wright's behalf, as he was required by law to do, but she failed to do so. *Id.* at 615-16. Additionally, the court opined that a reasonable jury could have concluded that Tarray deceived Wright by opening various unauthorized accounts, naming herself as an authorized cardholder, and making cash withdrawals. *Id.* at 616. Accordingly, the court affirmed Tarray's convictions. *Id.*

Returning to the State's case against Ana, we hold that there was sufficient evidence that Ana financially exploited Gustave through both undue influence *and* deception. As evidence that Ana exerted undue influence over Gustave, the State adduced testimony that Gustave's preference was to never leave his home on Munsey Street. Ms. Connor, the real estate agent, testified that when Gustave finally visited the house on Wilton Oaks, he did not show any interest in the house, and could not view the lower floor of the split-level because it had been "hard enough to [] get him to the living room area." Once the Molinas moved Gustave from Munsey Street to the house on Wilton Oaks, Gustave began

84

exhibiting mood changes and having outbursts that caused Ana to bring him to Dr. Hurley. Dr. Hurley noted that these outbursts were related, in part, to the fact that Gustave was a voracious reader and no longer had access to his book collection. Similarly, Ms. Alhalaseh testified that Gustave was very upset that the Molinas never moved his book collection to the Wilton Oaks house.

A jury could infer from these circumstances that Ana coerced Gustave to purchase the house against his will. *See Tarray*, 410 Md. at 610 ("One may infer coercion from the totality of the facts and circumstances surrounding the transfer of property."). Still, there was more direct evidence that Ana exerted such "domination and influence" that Gustave "was prevented from exercising free judgment and choice." CR § 8-801(a)(6)(i). When Ms. Libert asked Gustave for his address, he responded by asserting, "*They brought me here. They didn't ask me. I want to go to my house.*" (Emphasis added). Gustave also told Ms. Smith that Ana had taken all of his money, and he told Ms. Libert that he didn't know when he started giving Ana money and didn't know how much money she took.

The State also presented evidence from which a jury could have found that Ana facilitated Gustave's alienation from his only son, Dana, and then exerted undue influence to obtain a power of attorney and control of all of Gustave's bank accounts and assets. Evidence supporting this finding includes testimony from witnesses that Gustave never used a debit card, and instead wrote checks to himself to get cash; that he was adamantly against gambling; and that his bank transactions typically did not exceed $5,000 monthly. Gustave's frugality was sufficiently borne out for the jury to believe that he would not have

authorized the "explosion in regular cash withdrawals" and other large transactions that appeared on his financial records.

Ana demonstrated consciousness of guilt for exerting undue influence over Gustave when, without prompting, she volunteered copies of the house deeds to Ms. Libert after Mr. Libert had examined Gustave in his vulnerable state. Most compelling, though, is the fact that three independent strangers called APS to initiate three separate investigations after observing Ana and Gustave together.

This evidence stands in stark contrast to that in *Tarray*, in which Wright was not mentally or cognitively disabled and testified at trial that he gave Tarray the property based on his own free will. *See* 410 Md. at 611-12. Accordingly, we conclude that there was sufficient evidence that Ana financially exploited Gustave by exerting undue influence over him.

We also conclude that the State adduced sufficient evidence that Ana financially exploited Gustave through deception. Like Tarray, who was guilty of deceiving Wright by opening new accounts in Wright's name and drawing checks from those accounts without his knowledge, *see id.* at 615-16, there was ample evidence in this case that Ana obtained Gustave's property through deceptive means. *See* CR § 7-101(b)(1). We start with the premise that Gustave's bank transactions changed materially almost immediately after Ana came into his life. Ms. Alhalaseh first alerted APS because Ana and Gustave were attempting to withdraw $50,000 when Gustave typically withdrew only $5,000 per month. The State also demonstrated that, while in Ana's care, Gustave made several large bank transactions in the same amount, suggesting that Ana was asking him for the same money

86

to make the same purchase more than once. For instance, bank records reflected more than one withdrawal or transfer for $50,000, the amount purportedly used to purchase the Toyota Highlander.

There was also evidence of Ana's attempts to conceal her crimes through deception. For example, when police responded to the Wilton Oaks house, Ana represented that Gustave was her father. And she told Mr. Flynn that Javier's employer purchased the Toyota Highlander for him, knowing that this was false. From this evidence, a reasonable fact-finder could conclude that Ana was knowingly attempting to create a false impression related to her accrual of Gustave's property or that she was trying to prevent others from acquiring information that would raise suspicion about that property. *See* CR § 7-101(b)(1)(i), (iii).

Perhaps most damning, however, was evidence that Ana obtained the Wilton Oaks property through deceptive means. Specifically, there was testimony that the Molinas created the impression in Gustave that he had to purchase the Wilton Oaks house before he could see it. Ms. Connor confirmed that this was not true. Ana also deceived Gustave and others into believing that she intended to renovate the Wilton Oaks house to accommodate Gustave. Ana told Ms. Howard that they were purchasing the Wilton Oaks house because Gustave needed a place that was more accessible. She suggested that they planned to get Gustave a house with fewer steps and that they would install a chair lift. Despite these representations, as we know, the Molinas never completed the renovations, and several witnesses testified that the steps made the house inaccessible for Gustave because he was wheelchair-bound. Ana did, however, make other changes to the house. Using a debit card

87

linked to Gustave's account, she made several purchases at Home Depot, and she got new barstool-height dining room furniture that was not accessible to Gustave. As Ana explained to Ms. Smith, she knew the impression she created was false. *See* CR § 7-101(b)(1)(i). Ana admitted that she did not renovate the Wilton Oaks house because her failure to do so might cause Ms. Smith's nurses to expedite his move to an assisted-living facility.

The evidence establishes that Ana knew or reasonably should have known that Gustave was a vulnerable adult who was also well over the age of 68, and that she "knowingly and willfully" exploited Gustave by obtaining his property through both deception and undue influence. CR § 8-801(b). Accordingly, we hold that the State adduced sufficient evidence on each element of the crime of financial exploitation of a vulnerable adult to support the jury's verdicts beyond a reasonable doubt.

## VI.

### Sufficiency of the Evidence Against Javier

Javier avers that the evidence was insufficient to sustain his convictions for financial exploitation, theft scheme, and conspiracy. We address each conviction in turn.

### A. Financial Exploitation

The thrust of Javier's argument against his convictions under CR § 8-801 is that it was not enough for the State to show merely that he benefited from the funds that Ana facilitated in transferring out of Gustave's accounts. Nor was it enough, Javier continues, that he was present for some of the transactions, such as the purchase of the house on Wilton Oaks, because "his mere presence, standing alone, was insufficient to sustain a

88

finding of guilt." According to Javier, this leaves the evidence of his gambling, which predated Ana's care for Gustave, as the only basis for his convictions. And Javier insists that "the evidence of gambling was much too thin of a reed to sustain the convictions."

The State responds that it offered more evidence of financial exploitation than Javier's mere presence. For instance, the State points us to Javier's partial ownership of the non-wheelchair-accessible vehicle that Gustave purchased for the Molinas to take Gustave to doctors' appointments, as well as the Molinas' discussions that they would (though they did not) renovate the Wilton Oaks house to accommodate Gustave.

We held in Section IV that the State adduced more than 'some evidence' that Javier acted as Ana's accomplice in the commission of these crimes, and we just set out in Section V the elements of financial exploitation in our discussion relating to the evidence against Ana, so we will not rehash those discussions here. We hold that the evidence of accomplice liability that the State adduced permitted a reasonable fact-finder to conclude that Javier was guilty as Ana's accomplice in the financial exploitation of Gustave. *See* Discussion Sec. IV.

We also hold that the State adduced sufficient evidence from which a reasonable fact-finder could have concluded that Javier had the requisite scienter for both financial exploitation offenses, independent of his status as Ana's accomplice. Specifically, the evidence supported the jury's findings that Javier knew or should have known that Gustave was a vulnerable adult, and that he knew or should have known that Gustave was at least 68 years old. As we detailed above, Javier lived with Gustave during the period in which

Gustave, already displaying the physical effects of aging, suffered his sharpest decline mentally.

Javier is incorrect that the State's evidence showed only his mere presence. *See generally* Discussion Sec. IV. Javier was a signatory on the documents recording the two largest transactions, including the residential contract of sale for the Wilton Oaks house, and the MVA application for certificate of title for the 2014 Toyota Highlander. The purported purpose of purchasing both the Highlander and the Wilton Oaks house was to serve Gustave's needs. The evidence demonstrates that Javier knowingly failed to correct this false impression to further the Molinas' acquisition of Gustave's property. CR § 7-101(b)(1)(iii). He also failed to correct the Molinas' joint tax returns, even though Ana allegedly signed for him, to include *any* of the additional funds the Molinas were receiving from Gustave.[33] *See Franc v. Comm'r of Internal Revenue*, 99 T.C.M. (CCH) 1341, n.3 (T.C. 2010) (noting that "even if petitioner did not inscribe his signature on the returns, this does not necessarily mean that he did not file joint returns" because "it is not determinative that one spouse failed to sign" an "income tax return [] intended by both spouses as a joint return").

Accordingly, we hold that there was sufficient evidence upon which a jury could find beyond a reasonable doubt that Javier financially exploited Gustave, a vulnerable adult

---

[33] On their Maryland joint income tax returns, the Molinas declared income, from Javier's salary and gambling winnings that generated W-2Gs, between $26,000 and $68,000 from 2012 to 2016. The amounts declared on the returns do not account for Javier's 'dollars in' at the casinos he frequented, including, for instance, the $278,167 and $369,774 he gambled at Maryland Live using his player's card in 2015 and 2016, respectively.

who was also well over the age of 68, by "knowingly and willfully obtain[ing] by deception, intimidation, or undue influence [his] property." CR § 8-801(b)(1) & (b)(2).

## B. Theft Scheme

Section 7-104 of the Criminal Law Article codifies several modalities of theft. The jury in this case was instructed on three modalities: (1) unauthorized control over property; (2) unauthorized control over property by deception; and (3) possession of stolen property. The three modalities prohibit certain, but distinct, means of possessing or obtaining control over property. Specifically,

- Theft by unauthorized control prohibits "willfully or knowingly obtain[ing] or exert[ing] unauthorized control over property"; CR § 7-104(a);

- Theft by unauthorized control by deception prohibits "obtain[ing] control over property by willfully or knowingly using deception;" CR § 7-104(b); and

- Theft by possession of stolen property prohibits a person from "possess[ing] stolen personal property knowing that it has been stolen, or believing that it probably has been stolen[.]" CR § 7-104(c).

Regardless of the means by which a person wrongfully obtains or possesses property, the person may be found guilty of theft only if he or she:

- "intends to deprive the owner of the property;"
- "willfully or knowingly uses, conceals, or abandons the property in a manner that deprives the owner of the property; or"
- "uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property."

CR § 7-104(a), (b) & (c)(1).[34]

---

[34] Further, the statute provides:

### 1. Means of Obtainment and Possession

Javier insists that theft by possession of stolen property is the only modality by which he could have been found guilty under CR § 7-104. We disagree. We just held there was sufficient evidence to prove that Javier committed financial exploitation through deceptive means. *See* Discussion Sec. VI.A. The same deceptive means that supported that conclusion, also support a holding that Javier obtained unauthorized control of Javier's property by knowingly using deception within the meaning of CR § 7-104(b). For the unauthorized control modality, the State adduced evidence tending to prove that Javier gambled with money procured from Gustave's bank accounts. From this evidence, a reasonable fact-finder could have concluded that Javier obtained unauthorized control over Gustave's money within the meaning of CR § 7-104(a). Finally, even Javier does not challenge that there was sufficient evidence that he possessed certain property that the State alleged was stolen, considering that his name was on the title to the Highlander and the deed to Gustave's homes, and that money drawn from Gustave's bank account ended up in Javier's possession at the casinos. *See* CR § 7-104(c).

### 2. "Willfully or Knowingly"

Under each of the three theft modalities, the State was required to prove Javier's scienter—either that he "willfully or knowingly" deprived Gustave of the property or that

---

Unless the person who criminally possesses stolen property participated in the stealing, the person who criminally possesses stolen property and a person who has stolen the property are not accomplices in theft for the purpose of any rule of evidence requiring corroboration of the testimony of an accomplice.

CR § 7-104(c)(4).

92

he knew the property was stolen. The thrust of Javier's argument is not that he never possessed Gustave's property. Rather, he asserts that regardless of his possession or use of Gustave's money and personal property, the State failed to show that he had any reason to believe the money was stolen and not merely a generous gift from Gustave to Ana and her family.

Our recent opinion in *Ross v. State*, 232 Md. App. 72 (2017), illustrates how circumstantial evidence can prove that a defendant intended to act in furtherance of a theft scheme. Ross was a sales associate at the Sears Department Store in Annapolis, from which over 40 high-end televisions were stolen in one ongoing scheme. *Id.* at 76. The scheme began when a man attempted to purchase a television in person at Sears, but his card was declined, so the store, contrary to its policy, allowed someone purporting to be the man's father to provide a credit-card number over the phone to complete the transaction. *Id.* at 76-77. In the weeks that followed, that person and someone purporting to be his wife called regularly to purchase additional televisions that they claimed were for use in the family's barbershops. *Id.* at 77. When the credit-card company flagged any of these transactions as fraudulent, the cash register would prompt the sales associate to obtain an "authorization code" before completing the transaction. *Id.* Rather than obtaining the code themselves, the sales associates were permitting the customer to "call the company directly from [their] house phone and then relay the authorization code[.]" *Id.* at 78. The transactions would then go through. *Id.* After the credit card companies refused to cover these fraudulent purchases due to the failure to verify properly the purchases that required authorization codes, a supervisor at Sears "stressed the importance of these protocols" to

93

the sales associates, including Ross. *Id.* at 79. Nevertheless, Ross completed another 29 such transactions over the next five weeks. She assured her supervisor she was following protocols, but she was not. *Id.* at 80. After an investigation ensued, Ross changed her story and admitted to getting the codes from the customer, claiming she was "too busy" to call the credit-card company herself. *Id.* at 81. A jury convicted Ross of three counts of theft scheme over $100,000, and she challenged the sufficiency of the evidence on appeal. *Id.*

Our analysis on legal sufficiency proceeded in six parts. First, we reasoned that "the circumstances surrounding the sales of numerous highly priced [televisions] to the family . . . was such that [Ross] could be found to have had reason to suspect that something 'fishy' might be afoot. Not necessarily criminal, simply 'fishy.' Unusual, strange, out of the ordinary." *Id.* at 85. The reasons she should have suspected something strange was going on increased when her supervisor expressly ordered her to follow protocols. *Id.* at 85-87. From this, we observed, "[t]he jury could readily have concluded that [Ross] had good reason to be on high alert." *Id.* at 87.

Second, we determined that the evidence permitted a jury to conclude that Ross's failure to act to protect her employer was criminal. *Id.* at 87-88. Third, the evidence was sufficient to support a conclusion that Ross intentionally failed to get the proper authorizations, rather than supporting her excuse that she was "too busy." *Id.* at 88-89. Fourth, we observed that Ross "not only intentionally failed to follow the precautionary protocols but she then affirmatively lied about it." *Id.* at 89. We considered this deliberate lying as relevant evidence bearing on Ross's mens rea. *Id.* at 89-90. Fifth, we looked to her motive, including evidence the State adduced tending to show that Ross facilitated the

94

transactions to get the commission on the sales and evidence permitting the inference that she knew the other perpetrators and was part of the greater criminal enterprise. *Id.* at 91-95. Finally, we concluded that the totality of this evidence was legally sufficient to permit a fact-finder to conclude that Ross was guilty of three counts of theft of $100,000 or more. *Id.* at 93-94.

Javier had more than a whiff of something "fishy" afoot when his wife suddenly came into hundreds of thousands of dollars and stood to inherit two houses from a vulnerable, elderly man whose house she only recently started cleaning. *See Ross,* 232 Md. App. at 85. As we set out in our discussion in Section VI addressing Ana's conviction for financial exploitation, the persistent control that Ana took over Gustave's property and bank accounts for the Molinas' sole benefit, something Gustave lacked capacity to fully understand, was enough to alert several witnesses that something was wrong. In fact, three separate APS investigations resulted from witnesses sounding the alarm. Because Javier lived with Ana and Gustave, he had an opportunity to view the suspicious circumstances firsthand, including Gustave's isolation and his mental and physical decline. Indeed, Javier, who realized significant personal financial benefits, could not have missed or misunderstood the cumulative scope of the scheme his wife set in motion.

Although Javier did not owe a duty to Gustave as an employee (like the duty Ross owed to Sears), Javier was not, as country singer Ronnie Milsap crooned, just a "stand by my woman man."[35] He actively participated in the scheme despite the obvious signs that

---

[35] The song entitled "*(I'm A) Stand by My Woman Man*" was recorded by Ronnie Milsap and released in July 1976. RONNIE MILSAP, 20-20 VISION (RCA Records 1976).

it was criminal. Javier signed the documents that titled the Toyota Highlander, bought with Gustave's money, in his name; Javier viewed the Wilton Oaks house before its purchase and attended the closing, signing the deed to a house purchased in his name with Gustave's money; and Javier gambled far above his means at two casinos while a debit card linked to Gustave's bank account was used to withdraw at least $60,000 from nearby ATMs. From this evidence, we hold that a fact-finder could have reasonably concluded that Javier willfully and knowingly obtained, possessed, and deprived Gustave of his property. Accordingly, the evidence presented at trial in the light most favorable to the State would have permitted any "rational trier of fact [to find] the essential elements of [CR §§ 7-104(a)(2); 7-104(b)(2); 7-104(c)(1)(ii)] beyond a reasonable doubt." *Painter v. State*, 157 Md. App. 1, 10-11 (2004).

### C. Conspiracy

Javier challenges his two conspiracy convictions on the ground that the State adduced no evidence of a criminal agreement between him and Ana. He argues that neither his gambling history nor his mere presence at some of the transactions demonstrated a criminal agreement. According to Javier, the State's theory of guilt rests solely on his marriage to Ana. Even assuming one conspiracy conviction could stand, Javier continues, we must vacate the second because "there was absolutely no evidence of more than one conspiracy."

---

The song was a response to Tammy Wynette's song, "*Stand by Your Man*." Bob Kostanczuk, *Milsap Goes Retro: Country Singer Takes a U-Turn with New Album of Vintage Standards*, MERRILLVILLE POST-TRIB., Sept. 13, 2004, at D1.

The State acknowledges the merit of Javier's claim that one of his two conspiracy convictions must be vacated, but argues that there was sufficient evidence to allow a rational trier of fact to find that the Molinas conspired to obtain and deprive Gustave of his property. Pointing to evidence adduced to show that Javier "assisted [Ana's] deception and obtaining of [Gustave's] money and assets," the State asserts that Javier was "more than simply 'present' or simply the beneficiary of the deceptive conduct that led to [the Molinas] obtaining [Gustave's] property."

Criminal conspiracy is a common-law crime that "consists of the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Mitchell v. State*, 363 Md. 130, 145 (2001) (citations omitted). The essence of a criminal conspiracy is, therefore, an unlawful agreement, which "need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design." *Id.* at 145 (citations omitted). To prove conspiracy, the State may rely on "circumstantial evidence, from which a common scheme may be inferred." *Hall v. State*, 233 Md. App. 118, 138 (2017). The State does not have to show an "overt act in furtherance of the agreement" because the conspiracy "is complete when the unlawful agreement is reached[.]" *Bordley v. State*, 205 Md. App. 692, 723 (citation and internal quotation marks omitted).

Again, Javier insists that the State cannot carry its burden of proof based on his presence or his gambling alone. But, as we should have made clear by now, the State adduced evidence of more than Javier's presence during the commission of the crimes against Gustave. Javier's failure to correct Ana's misrepresentations about the Molinas'

plans to renovate the Wilton Oaks house and his continued occupancy of that house as Gustave deteriorated physically and mentally was proof that he and his wife were acting with a unity of purpose and design in furtherance of their unlawful scheme. *See Mitchell*, 363 Md. at 145. The gambling and financial records also tended to prove this same unity of purpose and design. None of the money that the Molinas obtained to fund Javier's gambling (or any other money the Molinas obtained from Gustave) was reflected on their joint tax filings. Based on this, we conclude that the State adduced sufficient circumstantial evidence that Javier engaged in a criminal conspiracy with Ana.

Though the State demonstrated the existence of an unlawful agreement between Javier and Ana, we agree with Javier's contention that "at most, there was only evidence of one conspiracy." In Maryland, "only one sentence can be imposed for a single common law conspiracy no matter how many criminal acts the conspirators have agreed to commit" because the "unit of prosecution [for conspiracy] is the agreement or combination rather than each of its criminal objectives." *Tracy v. State*, 319 Md. 452, 459 (1990). The conviction of a defendant for more than one conspiracy turns, therefore, "on whether there exists more than one unlawful agreement." *Savage v. State*, 212 Md. App. 1, 13 (2013). It is the State's "burden to prove the agreement or agreements underlying a conspiracy prosecution." *Id.* at 14. Where the State fails to establish a second conspiracy, "there is merely one continuous conspiratorial relationship . . . that is evidenced by the multiple acts or agreements done in furtherance of it." *Id.* at 17 (internal citations, quotation marks, and brackets omitted). As we explained in *Savage*, "[i]f a defendant is convicted of and

98

sentenced for multiple conspiracies when, in fact, only one conspiracy was proven, the Double Jeopardy Clause has been violated." *Id.* at 26.

To avoid double jeopardy violations, Maryland's appellate courts have vacated any unproven conspiracy convictions. In *Savage*, for example, we addressed the appellant's argument that his two conspiracy convictions violated the prohibition against double jeopardy because agreements he made with two individuals were part of *one overall conspiracy* to burglarize a home. *Id.* at 13. The State had not advanced a two-conspiracy argument, and the jury was not instructed that it had to find two separate agreements to find appellant guilty of more than one count of conspiracy. *Id.* at 31. We determined that "one of appellant's two conspiracy convictions must be vacated to avoid a [Double Jeopardy Clause] violation." *Id.* at 26. The Court in *Tracy* determined, similarly, that one conspiracy conviction had to be vacated because "even though there were two criminal objectives, there was only one conspiracy, one continuous conspiratorial relationship." 319 Md. at 460. As the Court explained, "[t]he agreement from its inception was to commit robbery and murder, but there was only one conspiracy since both crimes were the objective of the same agreement." *Id.* *See also Jordan v. State*, 323 Md. 151, 162 (1991) (vacating a conviction for conspiracy to commit robbery and affirming a conviction for conspiracy to commit murder where, "[t]hrough the single agreement, Tracy and Jordan conspired to commit murder and robbery"); *Ezenwa v. State*, 82 Md. App. 489, 504 (1990) (vacating one of two conspiracy convictions where there was "but one conspiracy with two objects").

Comparing the facts in this case to *Savage* and *Tracy* compels the same result—one of Javier's two conspiracy convictions must be vacated. As in *Savage*, the jury was not instructed that it had to find the existence of more than one agreement to find Javier guilty of more than one count of conspiracy. *See* 212 Md. App. at 31. The instructions given to the jury regarding conspiracy were as follows:

> Okay, there's a couple of conspiracy counts. I'm going to read to you the definition of a conspiracy. The defendants are charged with the crime of conspiracy to commit a theft scheme. . . .
> Okay, conspiracy is an agreement between two or more persons to commit a crime. In order to convict the defendants of conspiracy, the State must prove that each defendant agreed with at least one other person to commit the crime of a theft scheme and that each defendant entered into the agreement with the intent that the crime of theft scheme be committed.
> Conspiracy financial exploitation of a vulnerable adult. The defendants are charged with the crime of conspiracy to commit financial exploitation of a vulnerable adult. Conspiracy is an agreement between two or more persons to commit a crime. In order to convict the defendants of conspiracy, the State must prove 1) that each defendant agreed with at least one other person to commit the crime of financial exploitation of a vulnerable adult; and 2) that each defendant entered into the agreement with the intent that the crime of financial exploitation of a vulnerable adult be committed.

Ana's counsel objected to the failure to give an instruction on multiple conspiracies; the court noted the objection without instructing the jury further.

More importantly, the State did not adduce evidence of more than one agreement between Ana and Javier. Though the theft scheme and the financial exploitation of Gustave may be viewed as two criminal objectives, they are part of "only one conspiracy, one continuous conspiratorial relationship." *Tracy*, 319 Md. at 460. In other words, "there was only one conspiracy since both crimes were the objective of the same agreement," s*ee id.*

100

—the agreement between Ana and Javier, shown through their unity of purpose and design, to obtain Gustave's money and property. *See Mitchell*, 363 Md. at 145.

When there "is but one conspiracy with two objects[,] . . . only one penalty should be assessed. " *Ezenwa*, 82 Md. App. at 504. Therefore, even though the court merged the sentences for the conspiracy convictions into the substantive offenses, one of Javier's two convictions for conspiracy to commit financial exploitation of a vulnerable adult must be vacated. *See Savage*, 212 Md. App. at 31.

## VII.

## The State's Rebuttal Closing Argument

The Molinas both assign error to the trial court overruling Ana's objection to comments the prosecutor made during rebuttal closing.

> [THE STATE]: We listened to about two hours of Ana Molina's attorney talk to us about facts that are simply not correct. Putting aside the appropriateness or professionalism of trying to distract you from the facts of the case by [] making allegations against the prosecutors in this case, . . . let's just look at the actual misstatements of fact, and I'm going to do this quickly. Now for two hours we hear about all of these misstatements of fact. We hear about attacks on the prosecutor. You hear about questions that weren't answered or were answered from witnesses. You hear about how the prosecutors are trying to cover all this stuff up. **But where in those two hours did you hear anything about where that money went and why that money was spent in [Gustave's] best interests or according to his wishes? When did you hear that? For two hours we listened. When did you hear it? When did you hear that?**
> You heard an opening, and you heard –
>
> [ANA'S COUNSEL]: Objection, Your Honor, may we [approach?]
>           \* \* \*
> THE COURT: Yes.
>           (Bench conference follows:)
> [ANA'S COUNSEL]: I'm objecting to burden-shifting with the statement about where in the two hours did you hear where the money went, or an

explanation for it being in [Gustave's] best interest. It's one thing if the State wants to argue that the money did not go to his best interest, or give the theory about where the money went, but to say that the Defense did not say where the money went or how it was in his best interest, I don't have to do that, and that just placed a burden on the Defense that is improper, and . . . I'm not sure how it can be cured, but I think that [] overstepped the line.

[THE STATE]: It doesn't overstep the line. It simply points out the things that counsel chose to focus on, and the things counsel chose not to focus on. How does that burden-shift? Did I say that they failed to present any evidence or testimony about it? No, that would be burden-shifting.

THE COURT: Okay. Overruled. And by the way, the closing was an hour and 40 minutes.

Ana asserts that the State's comments during rebuttal closing "were improper and prejudicial" and "amounted to an impermissible shifting of the burden of proof." Similarly, Javier contends that his right to a fair trial was degraded when the prosecution, during rebuttal closing, effectively commented on his failure to testify and impermissibly shifted the burden of proof to the defense.[36] He explains: "By directing the jury's attention to the lack of evidence the defense presented—including potential evidence that only [the defendants] could supply—the prosecutor's comments shifted the burden and were

_____

[36] Before turning to the merits of this issue as applied to Javier's appeal, we must address the State's contention that the issue is not properly before us because only trial counsel for Ana, and not counsel for Javier, objected to the prosecutor's comments during rebuttal closing. Javier counters that "[c]ase law concerning reliance on a co-defendant's objection[] is not as clear-cut as the State suggests." He asks us to address his appeal, and insists that "the purpose of the preservation rule was served" here because Ana's objection "provide[d] the trial judge with an opportunity to 'get it right' the first time, so as to avoid the necessity, expense and delay of an appeal and possible new trial."

The comments to which Ana's counsel objected were directed specifically at Ana's counsel's failure to present evidence. How those comments implicated Javier's right to remain silent was not raised or decided below. Nevertheless, because the parties raise the same—yet, ultimately unpersuasive—arguments in support of this issue, we will exercise our discretion to address Javier's arguments on appeal rather than decline to address them.

102

reasonably susceptible of the inference by the jury that it could consider the lack of testimony by [the defendants]." Particularly given that the evidence against him was "nowhere near overwhelming," Javier concludes that the trial court's failure to give a curative instruction prevents the State from meeting its "heavy burden" to show that the trial court's error was harmless beyond a reasonable doubt.

The State's response is that when "a prosecutor makes a tailored response to an argument made by the defense counsel in closing argument, such argument will not constitute burden shifting, even if the response points out that the defendant has the ability to call witnesses or put on evidence." Specifically, the State argues that because defense counsel asserted that "[m]any of the assets that were acquired went toward[] the benefit of [Gustave,]" the court was correct to permit the prosecutor to highlight that defense counsel "never spoke about where the money that was not spent on assets went or how it was used for [Gustave's] benefit[.]"

The State is prohibited under the Fifth Amendment to the United States Constitution and Article 22 of the Maryland Declaration of Rights from commenting on a defendant's decision to not testify at trial. *See Griffin v. California*, 380 U.S. 609, 613-14 (1965); *Woodson v. State*, 325 Md. 251, 265 (1992) (citing *Smith v. State*, 196 Md. 474 (1936)). The decision to grant or denial a party's motion for a mistrial is one we review for abuse of discretion. *State v. Baker*, 453 Md. 32, 46 (2017). Our review as to whether a defendant's constitutional rights have been violated is, however, without deference. *Savage v. State*, 455 Md. 138, 157 (2017).

Maryland decisional law has interpreted this prohibition to protect defendants from indirect comments as well as direct ones. Indeed, the Court of Appeals has observed that a prosecutor's comment on a "defendant's failure to produce evidence to refute the State's evidence . . . might well amount to an impermissible reference to the defendant's failure to take the stand." *Eley v. State*, 288 Md. 548, 556 n.2 (1980). But even if the comment was not "tantamount to one that the defendant failed to take the stand," the Court continued, "it might in some cases be held to constitute an improper shifting of the burden of proof to the defendant." *Id.*

The State's comment on the defense's failure to produce evidence, however, will not always amount to impermissible burden-shifting. For instance, as directly pertinent to the case before us, the State may "argue or comment that the *unexplained* possession of recently stolen goods permits the inference that the possessor was the thief." *Smith v. State*, 367 Md. 348, 359 (2001) (emphasis added). In fact, the State can even request that the court instruct the jury that such an inference is permissible. *Dinkins v. State*, 29 Md. App. 577, 581-82, *opinion adopted*, 278 Md. 238 (1976); *see also Barnes v. United States*, 412 U.S. 837, 843-46 (1973) (upholding the use of such jury instructions, noting that the inference has enjoyed "longstanding and consistent judicial approval" with an "impressive historical basis"); *U.S. v. Prujansky*, 415 F.2d 1045, 1052 (6th Cir. 1969) (affirming the use of an instruction that "in effect directed [the jury] to look to the evidence for a reasonable explanation for [the defendant's] possession of the goods"). This is because a factual inference in the State's favor, left unrebutted by the defense, does not shift to the

defendant "a burden either of persuasion or of going forward with evidence[.]" *Evans v. State*, 28 Md. App. 640, 703 (1975), *aff'd*, 278 Md. 197 (1976).

But the State may not exceed the bounds of permissibly commenting on the absence of evidence by commenting, instead, "directly on the defendant's failure to testify." *Smith*, 367 Md. at 360. In *Smith*, the Court of Appeals determined that the prosecutor's comments on the inference relating to the unexplained possession of recently stolen goods were impermissible because the comments directly implicated Smith's failure to testify. *Id.* at 359-60. Smith had been found in possession of stolen leather goods; he did not testify at his trial. *Id.* at 351-52. During summation, the prosecutor told the jurors to ask themselves, "*What explanation* has been given to us *by the defendant* for having the leather goods? Zero, none." *Id.* at 352 (emphasis in *Smith*). The Court reasoned that the comments "referred to the defendant's decision to exercise his constitutionally afforded right to remain silent." *Id.* at 358. In the context of this appeal, we find significant the Court's distinction between comments that would be permissible, and the impermissible comments directed specifically at the defendant:

> The prosecutor did not suggest that his comments were directed toward[] the defense's failure to present witnesses or evidence; rather, the prosecutor referred to the failure of the defendant alone to provide an explanation. The prosecutor's comments were therefore susceptible of the inference by the jury that it was to consider the silence of the defendant as an indication of his guilt, and, as such, the comments clearly constituted error.

*Id.*

Applying the principles articulated in *Smith* to the facts before us, we agree with the State that the prosecutor's remarks in this case did not comment impermissibly on Ana's

decision not to testify. And those remarks, made in rebuttal to the closing arguments of Ana's counsel, were certainly not an impermissible comment on Javier's failure to testify. Unlike in *Smith*, in which the prosecutor stated specifically that "*the defendant*" offered "zero" explanation, the prosecutor in this case directed her comments to the defense attorney's recitation of the evidence. The prosecutor's remarks were limited in scope to the comments of defense counsel. After prefacing that she was responding to the ways in which Ana's counsel characterized evidence during her summation, the prosecutor referenced that closing argument specifically when commenting on the absence of evidence: "[W]here in those two hours did you hear anything about where that money went and why that money was spent in [Gustave's] best interests or according to his wishes? . . . For two hours we listened. When did you hear it?" We read these comments as highlighting the lack of any evidence explaining the defendants' possession of recently stolen goods. This is a permissible inference on which the State may comment. *See id.*; *Dinkins*, 29 Md. App. at 581-82. Because the State's argument did not violate the Molinas' constitutional rights, the trial court was within its discretion to overrule Ana's objection. *See Baker*, 453 Md. at 46; *Savage*, 455 Md. at 157.

> **JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AGAINST ANA MOLINA AFFIRMED; JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AGAINST JAVIER MOLINA AFFIRMED IN PART AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION TO VACATE ONE OF THE CONSPIRACY CONVICTIONS. ANA MOLINA TO PAY THE COSTS OF**

**HER APPEAL. COSTS OF JAVIER MOLINA'S APPEAL TO BE DIVIDED AS FOLLOWS: THREE-FOURTHS OF COSTS TO BE PAID BY JAVIER MOLINA; ONE-FOURTH OF COSTS TO BE PAID BY MONTGOMERY COUNTY.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/2537s17cn.pdf